UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 11-21227-CIV-LENARD/WHITE

ABDELAZIZ BILAL HAMZE,

     Plaintiff,

v.

SGT. JOHN DOE, et al.,

     Defendants.

_____/

## **DEFENDANTS' MOTION FOR ORDER IN LIMINE**

Defendants, Orlando Gonzalez ("Officer Gonzalez") and Rita Yeager ("Lt. Yeager"), move for an order in limine prohibiting Plaintiff from introducing evidence or making comment before the jury (including voir dire and opening statement) on the following matters:

    I.     **Government Liability or Insurance state-funded defense**.

In this case, no government entity is a party. Defendants are sued in their individual capacities. Plaintiff should be prohibited from suggesting that the State of Florida (the "State") or the Florida Department of Corrections ("FDOC") is responsible for Plaintiff's alleged damages. Plaintiff should also be prohibited from suggesting that the State or FDOC is funding the defense and will pay a jury award. Such comments would be substantially prejudicial without probative value, Fed. R. Evid. 403. *See also Carls Markets, Inc. v. Meyer*, 69 So.2d 789, 793 (Fla. 1953) (holding that references to insurance must be excluded so juries will not find liability where none exists or arrive at an excessive verdict based on the thought that payment will not be shouldered by the defendant).

For the same reasons, the Court should also prohibit any voir dire questions along the line of how prospective jurors feel about a person's right to stand up to the government by filing suit. Such questions would portray Plaintiff as David battling a governmental Goliath which is not the case because a government is not a party.

II.      **Officer of Inspector General Report of Investigation dated October 27, 2009**.

Defendants believe that Plaintiff will attempt to introduce the Office of the Inspector General Report of Investigation dated October 27, 2009 (the "IG report"), attached as Exhibit A. The IG report, and any testimony describing the IG report, should be excluded for at least three reasons. First, the IG report describes a post-incident investigation that is irrelevant and does not have a tendency to make any facts more probable under Plaintiff's claims of excessive force or failure to intervene since the IG report concludes that the evidence obtained was insufficient to determine if any physical assault occurred at the hands of staff on August 27, 2009. Fed. R. Evid. 401.

Secondly, the IG report presents clear hearsay within hearsay problems. The IG report contains statements and conclusions that are not based upon the investigating official's, Inspector Denmark, personal knowledge. Rather, the IG report presents Inspector Denmark's notes and summaries of multilevel hearsay statements of others, including the Plaintiff, Officer Edward Williams, Sergeant Jose Tartabull, and Lt. Yeager, for which no hearsay exception exists as required by Fed. R. Evid. 805; therefore, the IG report should be excluded.

Lastly, because the IG report contains multilevel hearsay statements and summaries of others as stated above, its probative value is substantially outweighed by the unfair prejudice to the Defendants and the needless presentation of cumulative evidence that would serve to unfairly bolster the Plaintiff and distract the jury from the relevant issues in the case. Fed. R. Evid. 403.

### III. **Photo line-up identification**

Defendants believe that Plaintiff will attempt to introduce evidence of the photo line-up identification of Lt. Yeager that occurred during Plaintiff's sworn statement to Inspector Denmark on August 28, 2009. First, any evidence of the prior photo-line up identification of Lt. Yeager is irrelevant since Plaintiff clearly names Lt. Yeager in the operative complaint [D.E. 125] as the female defendant under his failure to intervene claim. Second, Plaintiff should be prohibited from introducing any evidence of the photo line-up identification of Lt. Yeager because to do so would allow an improper bolstering of Plaintiff's credibility by a prior consistent statement before credibility is attacked as required by Fed. R. Evid. 801(d)(1).

Lastly, under Fed. R. Evid. 403, Plaintiff should be prohibited from introducing any evidence of the prior photo-line up identification of Lt. Yeager since its probative value is outweighed by the danger of unfair prejudice and because such evidence is cumulative. Again, Plaintiff clearly names Lt. Yeager in the operative complaint [D.E. 125] as the female defendant in this case under his failure to intervene claim and any unwarranted introduction of a prior consistent statement without an attack on credibility would prejudice Lt. Yeager.

### IV. **FDOC Incident Report dated August 28, 2009**.

Defendants believe that Plaintiff will attempt to introduce the FDOC Incident report dated August 27, 2009, written by Major Todd Sharpe (the "FDOC report"), attached as Exhibit B. The FDOC report, and any testimony describing the FDOC report, should be excluded for at least three reasons. First, the FDOC report summarizes statements from others and events that have nothing to do with what Plaintiff alleges occurred on August 27, 2009. Thus, the FDOC report is irrelevant and does not have a tendency to make any facts more probable under Plaintiff's claims of excessive force or failure to intervene on August 27, 2009. Fed. R. Evid.

3

401.  Secondly, the FDOC report also presents hearsay within hearsay problems.  The FDOC report consists of Major Sharpe's notes and summaries of multilevel hearsay statements from others, including Plaintiff, Sergeant Alston, Sergeant Windsor, a "White/Female Sergeant" and Nurse K. M. Fernandez, for which no hearsay exception applies as required by Fed. R. Evid. 805.  Therefore, the FDOC report should be excluded.  Lastly, because the FDOC report contains multilevel hearsay statements and summaries of others as stated above, its probative value is substantially outweighed by the unfair prejudice to the Defendants and the needless presentation of cumulative evidence that would serve to unfairly bolster the Plaintiff.  Fed. R. Evid. 403.

V.     **FDOC Mins Report dated August 28, 2009.**

Defendants believe that Plaintiff will attempt to introduce the FDOC Mins report dated August 28, 2009 (the "Mins Report"), attached as Exhibit C.  The FDOC Mins report, like the FDOC report, summarizes statements from others and events after the incident alleged by Plaintiff to have occurred on August 27, 2009.  Therefore, it clearly presents hearsay within hearsay problems for which there is no exception, Fed. R. Evid. 805, and is irrelevant because it does not have a tendency to make any facts more probable under Plaintiff's claims of excessive force or failure to intervene on August 27, 2009, Fed. R. Evid. 401.  And because the Mins report is based on multilevel hearsay statements and summaries of others, who will not appear at trial and be subject to cross examination, its probative value is substantially outweighed by the unfair prejudice to the Defendants and the needless presentation of cumulative evidence that would serve to unfairly bolster the Plaintiff.  Fed. R. Evid. 403.

VI.    **Plaintiff's Witness Statement dated August 28, 2009.**

Defendants believe that Plaintiff will attempt to introduce Plaintiff's Witness Statement dated August 28, 2009 (the "Witness Statement"), attached as Exhibit D.  First, the Witness

4

Statement presents hearsay within hearsay problems for which this there is no exception.  The Witness Statement consists of Plaintiff's summaries of alleged statements from other including, an unidentified black male, Sergeant Alston, Sergeant Windsor, and an unidentified female sergeant.   Second, Plaintiff should be prohibited from introducing any evidence of the Witness Statement because to do so would allow an improper bolstering of Plaintiff's credibility by a prior consistent statement before credibility is attacked as required by Fed. R. Evid. 801(d)(1). Lastly, because the Witness Statement contains so many hearsay statements from others, who are neither parties nor trial witness, its probative value is substantially outweighed by the unfair prejudice to the Defendants and the needless presentation of cumulative evidence that would serve to unfairly bolster the Plaintiff.  Fed. R. Evid. 403.

VII.   **IG Incident Report completed by Inspector Denmark**

Defendants believe that Plaintiff will attempt to introduce IG Incident Report completed by Inspector Denmark (the "IG incident report"), attached as Exhibit E.   To begin with, the IG incident report presents hearsay within hearsay problems for which there is no exception.  The IG incident report is Inspector Denmark's summary of Plaintiff's statements and should not come into evidence.  Also, like the Witness Statement, Plaintiff should be prohibited from introducing any evidence of the IG incident report because to do so would allow cumulative evidence to come in that would improperly bolster Plaintiff's credibility by a prior consistent statement before credibility is attacked as required by Fed. R. Evid. 801(d)(1). And like Plaintiff's Witness statement, the probative value of the IG incident report is substantially outweighed by the unfair prejudice to the Defendants.  The Defendants would be prejudiced by the introduction of summaries of an inspector who is not going to testify at trial or be subject to

cross examination as to his summaries, and through the needless presentation of cumulative evidence that would serve to unfairly bolster the Plaintiff.  Fed. R. Evid. 403.

VIII.    **FDOC request for inmate administrative remedy dated August 28, 2009.**

Defendants believe that Plaintiff will attempt to introduce the FDOC request for inmate administrative remedy dated August 28, 2009 (the "Inmate Request"), attached as Exhibit F.   To begin with, the Inmate Request presents clear hearsay within hearsay problems.   The Inmate Request consists of Plaintiff's summaries of alleged statements made by Sergeant Alston on August 17, 2018.  Sergeant Alston is not a named defendant in this case nor is he alleged to have participated as an actor in any of Plaintiff's claims.   Secondly, the statements alleged to have been made by Sergeant Alston are irrelevant because they do not have a tendency to make any facts more probable under Plaintiff's claims of excessive force or failure to intervene on August 27, 2009.  Fed. R. Evid. 403.  Third, the probative value of the Inmate Request is substantially outweighed by the unfair prejudice to the Defendants.   The Defendants would be prejudiced by the introduction of hearsay statements from Sergeant Alston who is not a named defendant in this action and through the needless presentation of cumulative evidence which would only serve to unfairly bolster the Plaintiff.  Fed. R. Evid. 403.

IX.    **Bureau of State Investigations Case Summary**

Defendants believe that Plaintiff will attempt to introduce the Bureau of State Investigations Case Summary dated August 28, 2009 (the "Case Summary"), attached as Exhibit G.  The Case Summary is a document, which like many of the documents identified above, that repeats the same narrative of events that occurred on August 27, 2009 and August 28, 2009, and is based on summaries of statements from others who are not specifically identified in the Case Summary.  Therefore, it should be excluded because (1) it is cumulative, Fed. R. Evid. 403., (2)

presents hearsay within hearsay from unidentified individuals without exception, Fed. R. Evid. 805, and (3) would serve to only bolster the Plaintiff's credibility.

X.   **De Minimis Injuries**

42 U.S.C. § 1997e(e), otherwise known as the Prison Litigation Reform Act ("PLRA"), requires Plaintiff to demonstrate that he suffered more than de minimis injury in order to seek punitive or compensatory damages.  Nominal damages are still available where the Plaintiff suffered only de minimis injuries.  Defendants believe the Plaintiff will attempt to submit evidence of his de minimis injuries in order to recover compensatory damages for mental or emotional injury and punitive damages.  However, Plaintiff should be limited to nominal damages based on the objective medical evidence as will be discussed in the next paragraph.

The FDOC Office of Health Services Diagram of Injuries dated August 28 2009, attached as Exhibit H, demonstrates that Plaintiff was diagnosed with  "multiple superficial abrasions" to his cheek, head, lower back, and back of the head, skin tear on right wrist and knee, and discoloration to his cheek, upper, and lower back.  The course of treatment prescribed for the diagnosed injuries, as documented in the Emergency Room Record dated August 28, 2009, attached as Exhibit I, was a prescription for ibuprofen and bacitracin, which is an ointment used to prevent infection in minor skin wounds, and x-rays were ordered for his elbow and knee.  The x-rays records from August 28 2009, attached as Exhibit J, show that there were no abnormal findings for either his elbow or knee.  In addition, Plaintiff's pre-special housing health assessments, attached as Exhibit K, dated August 28, 2009 and August 29, 2009, following his presentation of injuries, clearly show that Plaintiff was taking ibuprofen to treat his injuries.

 Case law in the Eleventh Circuit clearly establishes that the injuries presented by Plaintiff on August 28, 2009 were de minimis.  *See, e.g*., *Tate v. Rockford,* 497 F. App'x 921,

925 (11th Cir. 2012) (noting that laceration on forehead, several small abrasions and cuts, and a swollen right eye—but no broken bones or permanent injury—suggest de minimis injury); *McCall v. Crosthwait*, 336 F. App'x 871, 873 (11th Cir. 2009) (noting extent of injuries suffered by inmate were de minimis where inmate complained of pain in his shoulder and forearm, was diagnosed with a bruise on his right elbow and shoulder and received a prescription for ibuprofen); *Jacobs v. Gielow*, No. 3:11CV520, 2014 WL 905394, at *1 (N.D. Fla. Mar. 7, 2014) (finding that Plaintiff's injuries, self-inflicted cut to his left arm, scratches to his forehead, an abrasion to the back of his right arm, and a knot and cut to the back of his head were de minimis and barred inmate from punitive and compensatory damages under § 1997e(e)); *Hall v. Leavins,* No. 3:06CV351, 2009 WL 2905912, at *8 (N.D. Fla. Sept. 4, 2009) (finding de minimis injuries where inmate suffered tenderness in his wrist, two superficial abrasions and a two-inch "knot" or hematoma on his forehead, and a bruise, two superficial abrasions, and some swelling to his leg; inmate required no medical treatment other than cleaning and dressing his abrasions; no evidence of permanent injury, and no more than first aid treatment).

The medical records in this case establish that Plaintiff was prescribed ibuprofen and bacitracin to treat the superficial abrasions to his cheek, head, lower back and back of the head, skin tear on right wrist, and knee and discoloration to his cheek, upper, and lower back. There is no dispute that his x-rays showed no abnormal findings. There is no evidence in this case of permanent injury or a course of treatment for physical injuries beyond the first aid treatment Plaintiff received on August 28, 2009. Therefore, Plaintiff's recovery should be limited to nominal damages.

XI.     **Emergency Room Record dated August 28, 2009.**

Defendants believe that Plaintiff will attempt to introduce the Emergency Room Record dated August 28, 2009 (the "Emergency Room Record"), attached as Exhibit I.  The Emergency Room Record contains statements in the section titled "Description of occurrence" that should be excluded because they are not made for medical diagnosis or treatment in that they do not describe Plaintiff's medical history, past or present symptoms or sensation, their inception or general cause.  Fed. R. Evid. 803(4).  The "Description of Occurrence" section states:    "I/m states that at Approx. 11pm in kilo dorm officer called him into the state dorm's Officer Station where they began to punch him then threw him to the floor and began to kick him.  This activity occurred for approx. 5 minutes. When the activity ended he was then told to return to his cell." Statements as to fault are not encompassed within the exception because these statements are not generally understood as relating to diagnosis or treatment "[t]hus a patient's statement that he was struck by an automobile would qualify **but not** his statement that the car was driven through a red light."  Fed. R. Evid. 803(4) advisory committee note (emphasis added).  Therefore, the statements "I/m states that at Approx. 11pm in kilo dorm officer called him into the state dorm's Officer Station where . . " and  ". . [w]hen the activity ended he was then told to return to his cell" must be excluded because they are not related to diagnosis or treatment but hearsay statements related to fault.

XII.    **Chronological Record of Health Care dated August 28, 2009.**

Defendants believe that Plaintiff will attempt to introduce the Chronological Record of Health Care dated August 28, 2009 (the "Chronological Record"), attached as Exhibit L.  The Chronlogical Record contains a statement at the top of the document which reads "I/M reports sustained trauma received from 2 officers" and is a hearsay statement that goes to fault and is not

related to diagnosis or treatment.  Fed. R. Evid. 803(4) advisory committee note.  Therefore, the statement identified should be excluded.  The rest of the Chronological Record contains many statements that are illegible and not easily decipherable.  Therefore, the rest of the document should be excluded because its probative value is substantially outweighed by the unfair prejudice to the Defendants and the likelihood of confusion to the jury by language which is illegible and not easily decipherable.  Fed. R. Evid. 403.

XIII.   **Plaintiff's Deposition – Errata Sheet**

On May 18, 2015, Plaintiff drafted and then filed an errata sheet for his deposition taken nearly two years ago on June 24, 2013.   [D.E. 225-1].   In the errata sheet he makes significant changes to his testimony.   He replaces the names "Goldberg", "Rodriquez", "Williams" and "Johnson" with names of other officers, including the two named Defendants, Yeager and Gonzalez. *Id.*   Defendants seek to preclude Plaintiff from referring to or otherwise testifying about this new errata sheet at trial.

Fed. R. Civ. P. 30(e) permits a deponent to review his or her deposition transcript, and "if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1)(B).   All of this must be done within "30 days after being notified by the officer that the transcript or recording is available."  Fed. R. Civ. P 30(e)(1).

Plaintiff's errata sheet does not comply with requirements of Fed. R. Civ. P Rule 30. First, the errata sheet is untimely.  Plaintiff generated and filed his errata sheet nearly two years after his June 23, 2013 deposition, which is obviously well-beyond the 30 day timeframe mandated by Rule 30.   Second, Rule 30 further imposes substantive requirements as well: a deponent must offer an explanation for the changes.  Here, Plaintiff simply makes his changes

and omits the reasons for them.  For these reasons, Plaintiff's non-compliance with Rule 30 justifies preclusion of any testimony concerning his errata sheet.

Even if the Court were to overlook Plaintiff's non-compliance with Rule 30, Plaintiff's errata sheet raises additional issues that warrant exclusion.   As noted above, Federal Rule of Civil Procedure 30(e)(1) allows deponents to review the deposition and make changes "in form or substance" within 30 days of the deposition. Fed. R. Civ. P. 30(e)(1). Federal courts have taken two approaches to errata changes, one narrow and the other broad:

> The first line of cases holds that, absent some obvious confusion during a deposition or an error in transcription, deponents cannot make substantive changes to their deposition testimony through the use of an errata sheet.... Other courts are more lenient in allowing a deponent to change his or her testimony using an errata sheet.

*ChemFree Corp. v. J. Walter, Inc.,* No. CIV. 1:04–CV–3711, 2008 WL 5234247, at *1 (N.D. Ga. Sept.30, 2008). The Eleventh Circuit has not squarely held which standard applies in this Circuit, but has affirmed a district court who applied the more stringent test. *See Reynolds v. I.B.M. Corp.,* 125 F. App'x 982 (11th Cir. 2004), *aff'q* 320 F.Supp.2d 1290, 1301 (M.D. Fla. 2004)). More recently, the Eleventh Circuit upheld a sanctions award against attorneys in a title VII case based on improper behavior that included submission of an errata sheet that made many substantive changes to a deposition.[1]   *Norelus v. Denny's, Inc.,* 628 F.3d 1270, 1281-82 (11th

---

[1] In doing so, the Court cited to many cases finding substantive changes to deposition testimony improper: " *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.,* 397 F.3d 1217, 1225 (9th Cir.2005) (upholding a district court's judgment to strike an errata sheet listing twenty-seven changes, noting that "Rule 30(e) is to be used for corrective, and not contradictory, changes"); *Garcia v. Pueblo Country Club,* 299 F.3d 1233, 1242 n. 5 (10th Cir.2002) ("We do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony."); *Thorn v. Sundstrand Aerospace Corp.,* 207 F.3d 383, 388–89 (7th Cir.2000) (explaining that an errata sheet effecting "a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not' "); *Greenway v. Int'l Paper Co.,* 144 F.R.D. 322, 325 (W.D.La.1992) ("[Rule 30(e)] cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination."). *Id.*

Cir. 2010).  Indeed, the Court quoted one decision that characterized an Errata sheet that substantively changes testimony as a "foolish tactic." *Id.*, citing "*Thorn v. Sundstrand Aerospace Corp.,* 207 F.3d 383, 388–8.  A strong inference can be made that the Eleventh Circuit favors the more stringent approach based on the *Norelus* opinion and the affirmance in *Reynolds*, and the Defendants would urge the Court to adopt that course in this case.   Nonetheless, a split of opinion remains.  However, "[a]lthough courts are split on when it is appropriate to allow deponents to substantively change their deposition testimony, many courts agree that substantive changes to deposition testimony are particularly suspect when they are offered in response to a motion for summary judgment." *Chem Free, 2008 WL 5234247.*  Similarly, the Eleventh Circuit, citing a Third Circuit case, noted that Courts have discretion to disallow such testimony when the circumstances warrant.  *Nortelus,* 628 F.3d 1281-82, *citing EBC, Inc. v. Clark Bldg. Systems, Inc.,* 618 F.3d 253, 268 (3d Cir. 2010).

The circumstances in this case justify exclusion of any reference to the errata sheet.  To begin with, Plaintiff submitted an errata sheet after reviewing his deposition in July 2013 and made no mention of the changes he now attempts to make.  (See errata sheet attached as Exhibit M).  His second errata sheet comes on the eve of trial and is a transparent and obvious effort to align his deposition testimony with his theory at trial – namely that Lt. Yeager and Officer Gonzalez were the perpetrators of excessive force and not the officers originally named in his deposition.   In addition, the Defendants are prejudiced by this eleventh-hour alteration to Plaintiff's deposition testimony.  Nearly two years have gone by since the deposition and the

---

At the same time, the Court noted those cases that do not so hold:  "*but see Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 103 (2d Cir.1997) ("[T]he language of [Rule 30(e)] places no limitations on the type of changes that may be made, nor does [Rule 30(e)] require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes—even if those reasons are unconvincing." (quotation marks and alterations omitted)); *Reilly v. TXU Corp.,* 230 F.R.D. 486, 487–90 (N.D.Tex.2005) (reviewing the various approaches for interpreting the allowable scope of Rule 30(e) changes and ultimately adopting a broad interpretation "consistent with the plain language" of Rule 30(e), allowing any changes, "in form or substance" under Rule 30(e);  *Id.*

Defendants can no longer re-depose the Plaintiff with regard to this issue (as they may have been able to do if the errata sheet was offered timely).    The circumstances surrounding this last-minute change to a long-standing deposition warrant exclusion of any reference at trial of this new errata sheet.

In sum, Plaintiff's Errata sheet does not comply with rule 30.  In addition, it substantively alters his deposition testimony.  This fact alone justifies exclusion under the authorities that adopt the stringent approach described above.  But even if the Court does not adopt that approach, the circumstances nonetheless warrant exclusion anyway.    For these reasons, the Defendants respectfully request that this Court preclude Plaintiff from referring to the Errata sheet at the trial of this case, whether offered as a prior consistent statement under rule 801(d)(1)(b) or any other basis.

XIV.   **Hearsay Statements from Plaintiff's Deposition**.

Defendants believe that Plaintiff will attempt to introduce the following hearsay statements that were identified in Plaintiff's deposition, attached as Exhibit N.  Each hearsay statement will be discussed below.

1.  Page 11, lines 19 through 23

```
Q. Well, when they came and they called you out, what
did they say?

A. They say come down to the officers' station.

Q. And who called you out?

A. Officer Johnson.
```

The statement above should be excluded because it is an out of court statement offered in evidence to prove the truth of the matter asserted, Fed. R. Evid. 801.

2.  Page 18, lines 10 through 19

Q. Well, you say not during. When did they make
comments about your race?

A. Sergeant Goldberg, I heard her say, make comments
about my, you know, heritage earlier, a few, like maybe a
week earlier, or less than a week.
Q. All right. And what did she say?

A. She said we don't like you, all you, like people
from my background.

Q. And she said that before this attack?

A. Yeah.

The statements above should be excluded because they are out of court statements offered in

evidence to prove the truth of the matter asserted, Fed. R. Evid. 801.

3. Page 19, lines 13 through 17

Q. How do you know she knew?

A. Because she told me, we don't like you, all the
people from over there.

The statement above should be excluded because it is an out of court statement offered in

evidence to prove the truth of the matter asserted, Fed. R. Evid. 801.

4. Page 24, lines 13 through 18

Q. Did Sergeant Williams say anything to you?

A. Yes. He said something.

Q. What did he say?

A. He say like a challenging statement. Like what you
gonna do now? Or something. Or who you gonna fight? Or
who you gonna smack or hit?

The statement above should be excluded because it is an out of court statement offered in

evidence to prove the truth of the matter asserted, Fed. R. Evid. 801.

14

5. Page 25, lines 6 through 12

```
Q. Was anyone saying anything while you were on the
ground and they were kicking and hitting you?

A. I remember hearing the voice of Sergeant Goldberg,
but that was just the beginning.

Q. And what was Sergeant Goldberg saying?

A. I guess she told them to attack me. She -- It's not
audible very much because she said it in a low voice.
```

The statement above should be excluded because it is an out of court statement offered in evidence to prove the truth of the matter asserted, Fed. R. Evid. 801.

6. Page 26, lines 3 through 12

```
Q. Mm-hmm. And then what happened?

A. I told you, they stopped after they get tired and
then they told me to get up on my feet. I struggled
because I had injuries to my - they had kicked me
somewhere on my thigh and in my back, my back hip. I
struggled to get up on my legs, but I eventually did. And
they said, well, they told me that, you know, from now on
-- Like they threatened me, right? They say if you ever
show any disrespect to anybody, also, or say anything to
Sergeant Goldberg or anything, they gonna do it again.
```

The statements above should be excluded because they are out of court statements offered in evidence to prove the truth of the matter asserted, Fed. R. Evid. 801.

**7. Page 40, lines 17 through 24**

```
Q. And how do you know Sergeant Williams knew it?

A. Well, him and sergeant, another sergeant were talking
about it before.

Q. And what day was that?
```

The statement above should be excluded because it is an out of court statement offered in evidence to prove the truth of the matter asserted, Fed. R. Evid. 801.

**8. Page 41, lines 1 through 41**

Q. And what did you hear them say?

A. Well, I - one other sergeant was saying that I ran over, you know, a lady. But I didn't stop because I didn't want to aggravate the situation so I kept going.
Q. All right. So you heard Sergeant Williams tell another officer that –

A. No. Another sergeant telling Sergeant Williams.

Q. Another sergeant was telling Sergeant Williams. You don't know who the sergeant was?

A. Olsteen.

Q. Sergeant Olst?

A. Olsteen.

Q. And you heard Sergeant Olsteen telling Sergeant Williams that you ran over a lady?

A. Mm-hmm.

Q. Just a lady?

A. He said a lady, yeah. He said that that's the guy that ran over that lady. That lady. That means they knew what they was talking about.

XV.   **Hearsay Statement of Sergeant Alston**

Defendants believe that Plaintiff will attempt to introduce hearsay statements which he claims were made by Sergeant Alston on August 17, 2009.  In the FDOC report, attached as Exhibit B, Plaintiff refers to an alleged statement by Sergeant Alston on August 17, 2009, and states that Sergeant Alston pointed at him in the dining hall and said "kill yourself when you get a chance" and "kill yourself before I do."  Plaintiff discusses the same alleged statements made by Sergeant Alston on August 17, 2009, in the Inmate Request, attached as Exhibit F.  It is axiomatic that Federal Rule of Evidence 801 defines hearsay as a statement, other than one made

16

by the declarant while testifying at trial, which is offered into evidence to prove the truth of the matter asserted. Sergeant Alston's alleged out of court statements are irrelevant and would only serve to prejudice the Defendants since Sergeant Alston is not a named defendant in this case nor is he alleged to have participated in any Plaintiff's claims of excessive force or failure to intervene on August 27, 2009. Therefore, any suggestion or evidence as to his hearsay statements should be excluded.

XVI. **Plaintiff's speculation as to motives**

Plaintiff should not be permitted to speculate as to the motives for the excessive force he alleges occurred in the officers' station on August 27, 2009. Plaintiff in his deposition, page 16, lines 21 through 25, and page 17, line 1, states:

```
Q. Do you know why they would call you into the
officers' station and do this?

A. I can only guess.

Q. And what's your guess?

A. Either because of my nationality or something like that.
```

It is clear that Plaintiff has no personal knowledge and should not be permitted to speculate. Fed. R. Evid. 602.


On May 19, 2015, counsels for the Defendants conferred with Plaintiff's counsels in a good faith effort to resolve the issues raised in this motion. Plaintiff's counsels do not oppose sections I (Government Liability or Insurance state-funded defense) and XVI (Plaintiff's speculation as to motives) in this motion. Plaintiff's counsels do oppose all other sections in this motion.

17

WHEREFORE, Defendants requests entry of an order excluding evidence of the foregoing matters.

Respectfully submitted,

PAMELA JO BONDI
ATTORNEY GENERAL

/s/ Ely A. Gonzalez
ELY A. GONZALEZ
Assistant Attorney General
Fla. Bar No: 55879
John Bajger
Assistant Attorney General
Fla. Bar No: 027459
OFFICE OF THE ATTORNEY GENERAL
110 S.E. 6th Street, 10th Floor
Ft. Lauderdale, Florida 33301
Telephone:     954-712-4600
Facsimile:     954-527-3702
Ely.Gonzalez@myfloridalegal.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 20, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices or Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are authorized to receive electronically Notices of Electronic Filing.

/s/ Ely Gonzalez
Ely Gonzalez
Assistant Attorney General

18

<u>**SERVICE LIST**</u>

Hamze v. Doe, et al.
Case No: 11-21227-CIV-LENARD
United States District Court, Southern District of Florida


By CM/ECF:

Gary M. Pappas, Esq.
John A. Camp, Esq.
Carlton Fields Jorden Burt, P.A.
Miami Tower
100 S.E. Second Street, Suite 4200
Miami, FL 33131
Telephone: (305) 530-0050
Facsimile: (305) 530-0055
Email: gpappas@cfjblaw.com
Email: jcamp@cfjblaw.com
*Counsel for Plaintiff, Abdelaziz Bilal Hamze*



**Florida Department Of Corrections**
**Office of the Inspector General**
**Report of Investigation**
**Gene Hatcher, Inspector General**



**Inspector General Case #:** 09-42810

**Facility:** South Florida Reception Center

**Classification of Incident:** Physical Abuse

**Field Office/Region:** Fort Lauderdale / Region IV

**Incident Date:** August 27, 2009     **Time:** 11:00p.m.

**Inspector:** Terry Denmark

**Date of Report:** October 27, 2009

**Case Type:** C1

**Check all that apply:**

☐ **Confidential Medical Information**
☐ **Prison Rape Elimination Act** *(PREA)* **Number (if applicable)**
☐ **Principal(s) Exhibits Attached**
☒ **Department of Corrections presented to State Attorney** ☒     **Declined**     ☐     **Accepted**
☐ **Use of Force** *(UOF)* **Number (if applicable)**
☐ **Equal Employment Opportunity Commission (EEOC)**
☐ **Addendum**
☒ **Wing Video Camera(s) Present in the Area of Incident** ☐ **YES**     ☒ **NO**

**SUMMARY OF ALLEGATIONS:**

On August 28, 2009, Inmate Abdelaziz Hamze provided a grievance to Lieutenant Todd Sharpe which alleged that on August 27, 2009, he was physically abused by staff at South Florida Reception Center.

**SUMMARY OF DISPOSITION/JUSTIFICATION FOR DOWNGRADE/EXONERATION:**

It is recommended this matter be downgraded.

The evidence obtained during this investigation is not sufficient to determine that Sergeant Jose Tartabull physically abused Inmate Abdelaziz Hamze. Although Inmate Hamze had injuries consistent with being assaulted, the witnesses in this matter did not substantiate his version of the incident.



**EXHIBIT**

A



Florida Department Of Corrections
Office of the Inspector General
Report of Investigation
**Gene Hatcher, Inspector General**



**Case Number: 09-42810**

|  | Name | Title / DC # | D.O.B. | Employee ID # |
|---|---|---|---|---|
| **Complainant:** | Todd Sharpe | Lieutenant | 8-9-70 | 19283 |
|  |  |  |  |  |
| **Victim:** | Abdelaziz Hamze | L81379 | 4-23-83 |  |
|  |  |  |  |  |
| **Witness(es):** | Rita Yeager | Sergeant | 5-16-65 | 23873 |
|  | Edward Williams | Correctional Officer | 7-15-77 | 56289 |
|  |  |  |  |  |
| **Subject(s):** | Jose Tartabull | Sergeant | 9-24-66 | 20964 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Arrest:** ☐ Employee     ☐ Inmate     ☐ Other     ☐ **Guilty**          ☐ **Addendum Pending**
**Charges:**                                                ☐ **Not Guilty**
                                                          ☐ **Nolo Contendere**
☐ **Felony**          ☐ **Misdemeanor**          ☐ **P.T.I.**
**Date of Arrest:**                                       ☐ **Other (explanation):**
                                                          **Date Reported:**

**Sentence of Court / Agreement:**


**Administrative Violation(s):**

**Evidence:**     ☐     **Weapon**     ☐     **Drugs**     ☐     **Other**     **Describe:**
**Other Agency Case Number:**

**FINDINGS:**

In sworn recorded statements taken August 28, 2009, Inmate Abdelaziz Hamze indicated the following:

Inmate Hamze indicated that on August 27, 2009, at approximately 11:00pm he was called to the
Officer's station in K-dorm where he was housed. When he entered the area and closed the door a
Hispanic male officer hit him in the back of his head. Then a Black male sergeant hit him in the face and
both of these officers began striking and kicking him when he went to the floor. The officers then
stopped this assault and stated to him that he would respect the white female sergeant who was present.
Inmate Hamze indicated that he would show respect to the female sergeant then he was told to leave the
officer station.

Page 2

AH000103



Florida Department Of Corrections
Office of the Inspector General
Report of Investigation
**Gene Hatcher, Inspector General**



**Case Number:** 09-42810

Inmate Hamze was seen by medical staff at South Florida Reception Center on August 28, 2009, and his injuries were documented and treated. Photos of Inmate Hamze's injuries were also taken.
Inmate Hamze was shown a photo line up of six Black male sergeants and he identified Sergeant Jose Tartabull as the Black male sergeant hitting and kicking him. He was also shown a photo line up of six White female officers and he identified Sergeant Rita Yeager as being present and watching this assault. He also identified Sergeant Yeager as the person referred to whom he was told to respect.

During the interview Inmate Hamze described Officer Edward Williams as the officer working his dorm on August 27, 2009, and also witnessing the assault.

Inmate Hamze was shown a photo line up of six Hispanic male officers but he could not identify any of those officers as participating in this assault.                                    **(Exhibits B-1 & B-2)**

*On August 28, 2009, Inmate Hamze was seen by medical staff at South Florida Reception Center. The medical staff completed an Emergency Room Record (DC4-701C) and a Diagram of Injury (DC4-708) on that date. It was noted that Inmate Hamze had multiple superficial abrasions, bruising, swelling, redness and discoloration over his body.*

*On September 9, 2009, I contacted the Miami-Dade State Attorney's Office and spoke with Assistant State Attorney Bill Outfield. He advised to interview Officer Williams and Sergeant Yeager under "Garrity" and then contact his office again.*

In a sworn recorded statement taken September 11, 2009, Officer Edward Williams indicated the following:

He acknowledged that he was assigned to K-dorm on August 27, 2009. He indicated that Sergeant McQueen and Officer Orlando Gonzalez were also initially assigned with him however they were re-assigned by the Captain to other duties. After Sergeant McQueen and Officer Gonzalez were re-assigned the only other staff members to enter K-dorm were Officers Theresa Stephens and Trindalyn Kirkland who entered to assist with the first and second counts respectively. At no time did Sergeants Yeager or Tartabull come to K-dorm that night nor did any other staff. He does not know Inmate Hamze and no one physically abuse Inmate Hamze in his presence. He does not know why the inmate would implicate him as a witness in this matter but the inmate was not assaulted while he was assigned to K-dorm.
                                                                                          **(Exhibit B-3)**

*Although the K-dorm log supports Officer Williams' version of who entered the dorm during his shift, it should be noted his testimony indicates that the counts were not verified by him on the first count after Officer Stephens conducted the count or Officer Kirkland on the second count after he conducted the count.*

In a sworn recorded statement taken September 16, 2009, Sergeant Rita Yeager indicated the following:

On August 27, 2009, she was assigned as the Internal Security Sergeant. As part of her duties she would have reason to go into the dorms however on that night did not she go to K-dorm for any purpose. She

AH000104



**Florida Department Of Corrections**
**Office of the Inspector General**
**Report of Investigation**
**Gene Hatcher, Inspector General**



**Case Number: 09-42810**

does not know Inmate Hamze and does not recall ever talking to the inmate. She has not witness Sergeant Tartabull or any other staff physically abuse Inmate Hamze on that night or at any other time. The only time she was with Sergeant Tartabull was around the time of this alleged incident when he came to assist her in escorting inmates from the transfer and receiving area.          **(Exhibit B-4)**

*On October 6, 2009, I again contacted the Miami-Dade State Attorney's Office and spoke with Assistant State Attorney Johnnie Hardiman. She advised to proceed with this investigation administratively.*

In a sworn recorded statement taken October 15, 2009, Sergeant Jose Tartabull indicated the following:

On August 27, 2009, he was assigned as the Sergeant in H-dorm. After master count he did go to transfer and receiving about 11:00pm to assist Sergeant Yeager with processing inmates into the facility. He did not go to K-dorm that night and he does not know Inmate Hamze. He did not punch, kick or hit Inmate Hamze nor did he witness any other staff member hit, punch or kick the inmate.
                                                                        **(Exhibit B-5)**

*It should be noted that the South Florida Reception Center Control Room Log for August 27, 2009, does not reflect any inmates being in the transfer and receiving area at 11:00pm.*

| Terry Denmark | **Inspector** | October 27, 2009 | **Date** |
|---|---|---|---|
| | **Prison Inspector Supervisor** | | **Date** |
| | **Chief Prison Inspector** | | **Date** |
| | **Deputy/Inspector General** | | **Date** |

Page 4

AH000105

 

Florida Department Of Corrections
Office of the Inspector General
Report of Investigation
**Gene Hatcher, Inspector General**

**Case Number:** 09-42810

### EXHIBIT/ATTACHMENTS SECTION

**A.    EXHIBIT(s) - attached:**

**B.    EXHIBIT(s) - not attached:**

1. Sworn recorded statement of Inmate Abdelaziz Hamze
2. Sworn recorded statement of Inmate Abdelaziz Hamze
3. Sworn recorded statement of Officer Edward Williams
4. Sworn recorded statement of Sergeant Rita Yeager
5. Sworn recorded statement of Sergeant Jose Tartabull

Page 5

AH000108

DEPARTMENT OF CORRECTIONS

## INCIDENT REPORT

| | | | |
|---|---|---|---|
| **Reporting Institution:** | SFRC-Main Unit | **Incident Report Number:** | 09.08.UU.087 |
| **Reporting Employee:** | Lieutenant T. Sharpe | **PREA Number:** | |
| **Employee ID Number:** | 156741 | **Date of Incident:** | 8/28/2009 |
| **Person(s) Involved:** | I/M HAMZE, ABDELAZIZ #L81379 | **Time of Incident:** | 8:40AM |
| | | **Witness(es):** | |

**DETAILS OF INCIDENT:** On Friday, August 28, 2009, at approximately 8:40am, while assigned as Administrative Lieutenant, I was outside the Administrative offices when inmate Hamze, Abdelaziz DC#L81379 approached with a formal grievance asking who to turn it into. I reviewed his grievance and noted written allegations of staff abuse on 8/27/09, as I looked at inmate Hamze I noticed bruising to his head and wrist. Inmate Hamze claims he was assaulted in the Officer's station around 11:00pm by a Black/Male Sergeant and Hispanic/Male Officer while a fat Black/Male Officer and White/Female Sergeant watched. Inmate Hamze states the Hispanic/Male Officer initially struck him in the head and then the Black/Male Sergeant continued the assault. The assault lasted approximately five minutes and the fat Black/Male Officer and White/Female Sergeant did nothing to stop the assault. I asked inmate Hamze why he believes he was assaulted and he stated it is due to his crime; he is incarcerated for vehicular homicide of a Ms. Hall who is popular with the local black community and coordinating religious events. Inmate Hamze claims the harassment started on 8/17/2009, when Sergeant Alston pointed at him in the dining hall and said "kill yourself when you get a chance". Inmate Hamze asked what and Sergeant Alston replied, "kill yourself before I do".

| | | |
|---|---|---|
| Lieutenant T. Sharpe | *[signature]* | 8/28/2009 |
| Reporting Employee's Name (Print) | Reporting Employee's Signature | Date |

**Shift Supervisor**
**COMMENT:** Inmate Hamze was received at SFRC as a new commitment on 8/13/09 and has been housed in Kilo dorm. 1 asked inmate Hamze if he is able to name any of the staff that assaulted him and he said no, but that he thought he could identify them. I escorted Inmate Hamze to medical for evaluation of his injuries by Nurse K.M.Fernandez, she noted the following multiple superficial abrasions to inmate Hamze's left check, right head, lower back, back of head; skin tear on right wrist and left knee; Redness and discoloration to right flank, left cheek, upper back, lower back and right abdomen. An Emergency Room Record and Diagram of Injury were completed and eight digital pictures were taken. Inmate Hamze was placed in Administrative confinement pending investigation. The initial inmate request, formal grievance, inmate witness statement and RMS duty roster from third shift on 8/27/2009 are attached. EAC Duty Officer Gibson and Colonel Colon were advised.

| | | |
|---|---|---|
| Lieutenant T. Sharpe | *[signature]* | 8/28/2009 |
| Shift Supervisor's Name (Print) | Shift Supervisor's Signature | Date |

**REVIEW:** Noted. Inmate Hamze was placed in C1203 based alerted fits Kilo w/c date. Sgt. T. McQueen, Officer O. Gonzales and Officer E. Williams address inmate to Kilo Dorm during this allegation aprt 3:00am.

| | | |
|---|---|---|
| M. Inspector | *[signature]* Officer | |
| J. Colon | *[signature]* | RECEIVED |
| Correctional Officer Chief's Name (Print) | Correctional Officer Chief's Signature | Date |

**REVIEW:** M INS

| | | |
|---|---|---|
| CC: Inspector | *[signature]* | |
| David M. Harris | *[signature]* | 8/29/09 |
| Warden's Name (Print) | Warden's Signature | Date |

DC6-210 (Effective 3/3/08) (Revised 6/09)     Incorporated by Reference in Rule 33-602.210, F.A.C.     Page

**EXHIBIT**

B

**DETAILS OF INCIDENT (cont.)** Inmate Hamze told to the shift OIC and was to write it up. Inmate Hamze claims he completed an Inmate request and placed it in the grievance box near medical. Inmate Hamze claims on 8/19/09, Sergeant Alston made a comment about writing a grievance. Inmate Hamze claims on 8/20/09, he told Sergeant Windsor he wanted to withdraw the grievance. On 8/25/09, inmate Hamze alleges he was walking back to Kilo dorm after third recreation and the same White/Female Sergeant was sitting on the bench in front of Juliet dorm and said, "we don't like you here because you are a smart ass. If I see you again you are in violation. We can put you in confinement and get you another charge." Inmate Hamze states another White/Male Officer was present on the bench. Inmate Hamze claims on 8/27/09 at approximately 9:30pm, he received the inmate request back Unanswered and the assault happened later that night.

**SHIFT Supervisor COMMENT (cont.):**

**REVIEW (cont.):**

**REVIEW (cont.):**

Supporting Documents Attached_____

```
08/31/2009              FLORIDA DEPARTMENT OF CORRECTIONS              PAGE: 1
MIN0101                 MINS INCIDENT REPORT                            TIME 10:10


PREPARED BY: T402MM1 MEDINA, MELISSA          INCIDENT NUMBER: 0000299892
INCIDENT TYPE: 10A PHYSICAL ABUSE             STATUS OF INCIDENT: C CASE
REPORT DATE:   08/28/2009                      REPORT TIME:   15:59
INCIDENT DATE: 08/28/2009                      INCIDENT TIME: 08:40
REPORT LOCATION: 402 S.F.R.C.                  REPORT REGION: 4
IG NUMBER: 0942810                             UOF NUMBER:
IG ASSIGNED: DENMARK, TERRI T                  DATE IG ASSIGNED: 08/31/2009
INCIDENT LOCATION: 10 OTHER                    DAY CODE: 5       SHIFT CODE: 2
INJURIES: Y          STG/STI INVOLVEMENT: N    PHYSICAL EVIDENCE RECOVERED: Y
USE OF FORCE: N   CONFIDENTIAL: N              INCIDENT VIDEO TAPED: N
ELECTRONIC RESTRAINING DEVICES: N             CHEMICAL AGENTS USED: N


            NAME               TITLE          BIRTHDATE  R S    ID NUMBER
------------------- ----------------------    ---------- - - ----------------
COMPLAINANT (S)
  SHARPE, TODD A.   CORRECTIONAL OFFICER LI 08/09/1970 1 1 19283
SUBJECT (S)
  ****, ****   .    UNKNOWN SERGEANT                   9 9 XXXXX
  GONZALEZ, ORLANDO . CORRECTIONAL OFFICER   07/30/1965 3 1 30543
WITNESSES (S)
  ***, ***   .      UNKNOWN SERGEANT                   9 9 XXX
  WILLIAMS, EDWARD D. CORRECTIONAL OFFICER   07/15/1977 2 1 56289


    CONTRABAND RECOVERED          QUANTITY    UNIT OF MEASURE
------------------------------   ---------   ---------------


DESCRIPTION OF PHYSICAL EVIDENCE:
    EIGHT DIGITAL PICTURES & INITIAL INMATE REQUEST, FORMAL
    GRIEVANCE AND INMATE WITNESS STATEMENT


MEDICAL DEPT. DESCRIPTION OF INJURIES:
    MULTIPLE SUPERFICIAL ABRASIONS TO INMATE HAMZE'S LEFT CHECK,
    RIGHT HEAD, LOWER BACK, BACK OF HEAD; SKIN TEAR ON RIGHT
    WRIST AND LEFT KNEE; REDNESS AND DISCOLORATION TO RIGHT
    FLANK, LEFT CHEEK, UPPER BACK, LOWER BACK AND RIGHT ABDOMEN.


DESCRIPTION OF INCIDENT:
    ON 8/28/09 AT APPROXIMATELY 9:40AM, LT. SHARPE WAS OUTSIDE
    THE ADMINISTRATIVE OFFICES WHEN INMATE HAMZE, ABDELAZIZ
    DC#L01379 APPROACHED WITH A FORMAL GRIEVANCE ASKING WHO TO
    TURN IT INTO.  LT. SHARPE REVIEWED THE GRIEVANCE AND NOTED
    WRITTEN ALLEGATIONS OF STAFF ABUSE ON 8/27/09, AS HE LOOKED
    AT INMATE HAMZE HE NOTICED BRUISING TO HIS HEAD AND WRIST.
    INMATE HAMZE CLAIMS HE WAS ASSAULTED IN THE OFFICER'S
    STATION AROUND 11:00PM BY A BLACK/MALE SERGEANT AND
    HISPANIC/MALE OFFICER WHILE A FAT BLACK/MALE OFFICER AND
    WHITE/FEMALE SERGEANT WATCHED.  INMATE HAMZE STATES THE
```

EXHIBIT

C

08/31/2009    FLORIDA DEPARTMENT OF CORRECTIONS   PAGE: 2
MINO101     MINS INCIDENT REPORT     TIME 10:10

    HISPANIC/MALE OFFICER INITIALLY STRUCK HIM IN THE HEAD AND
    THEN THE BLACK/MALE SERGEANT CONTINUED THE ASSAULT.  THE
    ASSAULT LASTED APPROXIMATELY FIVE MINUTES AND THE FAT
    BLACK/MALE OFFICER AND WHITE/FEMALE SERGEANT DID NOTHING TO
    STOP THE ASSAULT.


ACTION TAKEN:

    INMATE HAMZE WAS RECEIVED AT SFRC AS A NEW COMMITMENT ON
    8/13/09 AND HAS BEEN HOUSED IN KILO DORM. LT. SHARPE ASKED
    INMATEHAMZE IF HE IS ABLE TO NAME ANY OF THE STAFF THAT
    ASSAULTED HIM AND HE SAID NO, BUT THAT HE THOUGHT HE COULD
    IDENTIFY THEM.  LT. SHARPE ESCORTED INMATE HAMZE TO MEDICAL
    FOR EVALUATION OF HIS INJURIES BY NURSE K.M.FERNANDEZ, SHE
    NOTED THE FOLLOWING MULTIPLE SUPERFICIAL ABRASIONS TO INMATE
    HAMZE'S LEFT CHECK, RIGHT HEAD, LOWER BACK, BACK OF HEAD;
    SKIN TEAR ON RIGHT WRIST AND LEFT KNEE; REDNESS AND
    DISCOLORATION TO RIGHT FLANK, LEFT CHEEK, UPPER BACK, LOWER
    BACK AND RIGHT ABDOMEN.  AN EMERGENCY ROOM RECORD AND
    DIAGRAM OF INJURY WERE COMPLETED AND EIGHT DIGITAL PICTURES
    WERE TAKEN.  INMATE HAMZE WAS PLACED IN ADMINISTRATIVE
    CONFINEMENT PENDING INVESTIGATION.  THE INITIAL INMATE
    REQUEST, FORMAL GRIEVANCE, INMATE WITNESS STATEMENT AND RMS
    DUTY ROSTER FROM THIRD SHIFT ON 8/27/2009 ARE ATTACHED.  EAC
    DUTY OFFICER GIBSON AND COLONEL COLON WERE ADVISED.

**Witness Statement**

| State of Florida | Log # | Department of Corrections |
|---|---|---|

**I.  Identifying Inmate Information**

DC # 180550          Inmate Name

Violation Code and Short Title

Use of Force #

Date Report Written

**II.  Witness**

☐  Staff Member:  Name and Position _____

☐  Other Individual:  Name _____

☐  Inmate:     DC # _____     Name _____

**III.  Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____     Date _____

Signature of Investigating Officer _____     Date _____

**IV.  Statement**

On Aug 27 at around 11pm I was called from my room to the officer's station and there the Sgt. in there, who is a black male, told me to come in and close the door behind me and then he asked, "who are you gonna snatch" and then a hispanic male hit my head from behind and the Sgt. who asked me also punched me and they both started throwing punches and I fell on the floor and then they started kicking me and punching me more. And afterwards the black male Sgt. told me do you see this lady, pointing at the white female Sgt. that had stopped me on Aug 26, "You are gonna respect her."

Present in the officer's station were also another black fat male officer and a white female officer, the one mentioned earlier.

Witness Signature _____     Date Aug 28, 2009

Signature of Investigating Officer _____ LT. _____     Date 8/28/09

**EXHIBIT**

**D**

**Witness Statement**

| State of Florida | Log # ___ | Department of Corrections |
| --- | --- | --- |

**I.    Identifying Inmate Information**

DC # 187330   Inmate Name

Violation Code and Short Title

Use of Force #

Date Report Written

**II.    Witness**

☐   Staff Member:  Name and Position _____

☐   Other Individual:  Name _____

☐   Inmate:   DC # _____   Name _____

**III.    Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____   Date _____

Signature of Investigating Officer _____   Date _____

**IV.    Statement:** On Aug 17, Sgt. Alsten said to me as I was in the chile
Hall "Kill yourself" several times: and then he said: "before I do"
So I wrote that on a request form. Around Aug 19 also in the chile
Hall Sgt. Alsten said that I was trying to write him and he said
: "Definately kill yourself". I felt that he was going to retaliate
so I told Sgt. Windsor that I want to withdraw the form
and he asked me which box did I put it in and I told
him I put it in the one in front of medical/classification
door and he said: "I'll see what I can do for you". I got
that request form back on Aug 27, 09 during mail round.

On Aug 25, 09 a female white srgt. stopped me while going
back to my dorm from the yard and told me: "We don't
like you here because you are a smart ass, we will lock you
up and give you an add charge and let the inmates fuck
with you" I asked her: "what kind of charge? and she
said: "we'll come up with something"

Witness Signature _____   Date Aug 28, 2009

Signature of Investigating Officer Lt. Thayne   Date 8/28/09

AH000114

**DEPARTMENT OF CORRECTIONS**
**OFFICE OF INSPECTOR GENERAL**
**INCIDENT REPORT**

**LOCATION:**        South Florida Reception Center

**DATE/TIME OF**
**OCCURANCE:**     August 27, 2009        11:00pm

**VICTIM:**           Abdelaziz Hamze
                     DC# L81379
                     DOB: 4-23-83 O/M

**SUBJECT(S)**        Jose Tartabull, Sergeant
                     DOB: 9-24-66 H/M

                     Rita Yeager, Sergeant
                     DOB: 5-16-65 W/M

                     Edward Williams, Correctional Officer
                     DOB: 7-15-77 B/M

                     Unidentified Hispanic Male Correctional Officer

**INVESTIGATOR:**   Terry Denmark

**M.O.**            Physical Abuse

**NARRATIVE:**

On August 28, 2009, I was instructed to conduct a sworn recorded interview with Inmate Abdelaziz Hamze based on his allegation of physical abuse at South Florida Reception Center.

Inmate Hamze indicated that on August 27, 2009, he was called to the Officer's station in K-dorm where he was housed. When he entered the area and closed the door a Hispanic male officer hit him in the back of his head. Then a Black male sergeant hit him in the face and both of these officers began striking and kick him when he went to the floor. The officers then stopped this assault and stated to him that he would respect the white female sergeant who was present. Inmate Hamze indicated that he would show respect to the female sergeant then he was told to leave the officer station.



EXHIBIT
E

Inmate Hamze was seen by medical staff at South Florida Reception Center on August 28, 2009, and his injuries were documented and treated. Photos of Inmate Hamze injuries were also taken.

Inmate Hamze was shown a photo line up of six Black male sergeants and he identified Sergeant Jose Tartabull as the Black male sergeant hitting and kicking him. He was also shown a photo line up of six White female officers and he identified Sergeant Rita Yeager as being present and watching this assault. He also identified Sergeant Yeager as the person referred to whom he was told to respect.

During the interview Inmate Hamze described Officer Edward Williams as the officer working his dorm on August 27, 2009, and also witnessing the assault.

Inmate Hamze was shown a photo line up of six Hispanic male officers but he could not identify any of those officers as participating in this assault.

**INMATE REQUEST**

STATE OF FLORIDA
DEPARTMENT OF CORRECTIONS

(Instructions on Back)

Mail Number: _____
Team Number: __13__
Institution: __SFRC__

| TO: (Check One) | ☐ Warden ☐ Asst. Warden | ☒ Classification ☒ Security | ☐ Medical ☐ Mental Health | ☒ Dental ☒ Other: _Captain Abst 50n_ |

| FROM: | Inmate Name Abdelaziz Hamze | DC Number L81379 | Quarters R13034 | Job Assignment — | Date Aug 19,09 |

**REQUEST**

on Aug. 17, 2009 at about 1:00 pm in the chile hall Srgt. Alsten pointed me out and said do me in a loud and well heard voice : "Kill yourself when you get a chance" "Kill yourself" I asked him "what?" He said again : "Kill yourself before I do" -- before I do".

All requests will be handled in one of the following ways: 1) Written Information or  2) Personal Interview.  All informal grievances will be responded to in writing.

---

DO NOT WRITE BELOW THIS LINE

**RESPONSE**                                    DATE RECEIVED: _____

[The following pertains to informal grievances only:]

Based on the above information, your grievance is _____. (Returned, Denied, or Approved). If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.)

| Official (Signature): | | Date: |

Distribution:  White      -Returned to Inmate        Pink  -Retained by official responding, or if the response is to an
                Canary    -Returned to Inmate                    informal grievance then forward to be placed in inmate's file.
DC6-236 (Revised 8/07)

Incorporated by Reference in Rule 33-103.019, F.A.C.

**EXHIBIT**

F

# Bureau of State Investigations
## Case Summary
## Case Number: 09-4-2810

**Facility:** S.FLA.RECEPTION CTR
**Class:** PHYSICAL ABUSE (COMPLNTS)

**Case Type:** C1   **Priority:**
**Special Category:**

**Assigned:** 8/31/09   **Incident Date:** 8/28/09   **Incident Time:** 8:40:00 AM

**Super Appv:** 10/28/09   **Cent Office Appv:** 10/28/09

**Distributed:** 10/28/09 **Addendum Pend:** No   **Addend. Date:**

**Disp. Date:** 10/28/09

**Background Narrative:**
ON 8/28/09, AT APPROXIMATELY 8:40 A.M., LT. SHARPE WAS OUTSIDE THE
ADMINISTRATIVE OFFICES WHEN INMATE HAMZE, ABDELAZIZ DC#L81379
APPROACHED WITH A FORMAL GRIEVANCE ASKING WHO TO TURN IT INTO.
LT. SHARPE REVIEWED THE GRIEVANCE AND NOTED WRITTEN
ALLEGATIONS OF STAFF ABUSE ON 8/27/09, AS HE LOOKED AT INMATE
HAMZE HE NOTICED BRUISING TO HIS HEAD AND WRIST. INMATE HAMZE
CLAIMS HE WAS ASSAULTED IN THE OFFICER'S STATION AROUND 11:00 P.M.,
BY A BLACK/MALE SERGEANT AND HISPANIC/MALE OFFICER WHILE A FAT
BLACK/MALE OFFICER AND WHITE/FEMALE SERGEANT WATCHED. INMATE
HAMZE STATES THE HISPANIC/MALE OFFICER INITIALLY STRUCK HIM IN THE
HEAD AND THEN THE BLACK/MALE SERGEANT CONTINUED THE ASSAULT.
THE ASSAULT LASTED APPROXIMATELY FIVE MINUTES AND THE FAT
BLACK/MALE OFFICER AND WHITE/FEMALE SERGEANT DID NOTHING TO
STOP THE ASSAULT. (MINS#299892, SJ)

**Sustained: No**   **Unsustained: No**   **Exonerated: No**

**Disposition:**
Per Supervisor Harrell, this case is downgraded and closed;The evidence obtained during
this investigation is not sufficient to determine that Sergeant Jose Tartabull physically
abused Inmate Abdelaziz Hamze. Although Inmate Hamze had injuries consistent with
being assaulted, the witnesses in this matter did not substantiate his version of the
incident.(KH, JS)

**EXHIBIT**

G

**Inspector(s)**
DENMARK, TERRY T

**Complainant(s)**
SHARPE, TODD
A (CORRECTIONAL OFFICER
LIEUTENANT)

**Victim(s)**
HAMZE, ABDELAZIZ (Active
Inmate) L81379

**Subject(s)**
TARTABULL JR,
JOSE (CORRECTIONAL OFFICER
SERGEANT)

**Witness(es)**
YEAGER, RITA
M (CORRECTIONAL OFFICER
SERGEANT)
WILLIAMS, EDWARD
D (CORRECTIONAL OFFICER)

AH000002

**FLORIDA DEPARTMENT OF CORRECTIONS**
**OFFICE OF HEALTH SERVICES**
**DIAGRAM OF INJURY**



Date of occurrence 8/27/09          Time of occurrence Approx. 11 PM

☐ No injury identified

Description of injury  I/m has multiple superficial abrasions including ® cheek ®head, lower back, back of head. Skin tear ® wrist, ® knee. Redness and discoloration ® flank, ® cheek upper back, lower back ® abd.

Staff Signature  K Fernandez | Fernandez LPN SFRC

Inmate Name Hamze, Abdelaziz
DC# L81379              Race/Sex W/m
Date of Birth 04/28/83
Institution SFRC

This form is not to be amended, revised, or altered without approval
of the Deputy Assistant Secretary of Health Services Administration

DC4-708 (Revised 3/06)



EXHIBIT
H

**FLORIDA DEPARTMENT OF CORRECTIONS**
**EMERGENCY ROOM RECORD**

Check one:   ☒ Inmate/Post-Use-of-Force Exam
☐ Employee:   ☐ Post-Use-of-Force Exam  OR  ☐ Injury  OR  ☐ Physical Altercation
☐ Visitor/Injury

All inmates must receive a complete assessment following a use of force. This includes a visual inspection of the entire body to identify any sign of injury. This exam shall be performed in the medical unit except under unusual circumstance. Injuries shall be documented on the DC4-708 *Diagram of Injury*. If a physician/CA is not present at the time of the exam, a physician/CA must review this form and sign it on the next working day.

Time of occurrence: Approx. 11pm 8/27/09   Time of exam: 8/28/09 0930

Description of occurrence:
I/m states that at approx. 11pm in Kilo dorm the dorm officers called him into the dorm's officer station where they began to punch him then threw him to the floor and began to kick him for error. This activity occurred for approx. 5 minutes. when the activity ended h was then told to return to his cell. K12034

Inmate showered without soap (if post-use of chemical agent)?   ☐ Yes   ☐ Refused   ☒ N/A

Vital Signs:   Temperature 97.9°   Pulse 62   Respiration 17   Blood Pressure 112 , 77

Arrived via:   ☒ Ambulatory   ☐ Stretcher   ☐ Wheelchair   ☐ Other:

Condition on arrival (check all that apply):   ☒ Alert   ☒ Oriented x 4 (person, place, time, situation)   ☒ Responding to questions verbally
☐ Other (requires description in assessment/summary)
☒ C/O pain? If checked, where? Head, chest area, back area, ⓛ knee, ⓛ elb

Assessment summary:
I/m is AAOx4. Responding well to commands. Full active ROM present NAD lungs sounds clear BLE. @ c/o discomfort. some pain voiced by I/m in injured areas. (see DC4-701). Steady gait, ∅ c/o dizziness, vertigo or N/V at this time.

Physician notified?   ☐ No   ☒ Yes   Name: Dr. Mirander   Time: 0950

Treatment provided?   ☐ No   ☒ Yes   If yes, describe: Ibuprophen 600mg PRV, local wand care to effected areas, bacitracin c 2x2's. X Ray to ⓛ elbow, ⓛ knee.
Response to Treatment:

Disposition:   ☐ Population   ☒ Confinement   ☐ Infirmary   ☐ Hospital   ☐ Rescue   ☐ Other (explain):

Discharge Instructions and Education:
Keep affected areas clean, dry. Advise medical if any s/s persist or begin.

Health Care Provider's Signature and Stamp: R. Perneros/   Date/Time: 8/28/09 1010

Reviewing Physician's Signature and Stamp: [signature]   Date/Time: 9/10/09
DR. M. MIRANDER, CHO

Name Hamze, Abdelaziz   SERC   Inmate Distribution:   White—Health Record
DC# L81379   Race/Sex W/M   Canary—Inspector General
Date of Birth 04/23/83   Pink—Local Requirements
Institution SFRC   Employee Distribution:   White—Safety Officer/Designee
Canary—Employee Copy
Pink—DESTROY

This form is not to be amended, revised, or altered without approval of the Deputy Assistant Secretary of Health Services Administration

DC4-701C (Revised 7/02)

**EXHIBIT**

I

Patient_Report

Hamilton

CrRC

Page 1 of 1

| | **SFRC** | | **Date: 08/30/2009** |
|---|---|---|---|
| | | | L813M |
| **Name** | : hamze abdelaziz | **Id #** | : 181379 |
| **Date of Birth** | : 4/23/1983 | **Date Ordered** | : 08/28/2009 |
| **Exam No** | : 6ad082809ah | **Ref. Physician** | : MIRANDER MD |
| **Date of Service** | : 08/28/2009 | **Technologist** | : MAXE ETIENNE |

**Exam** : Elbow Complete Left

**Reason for Exam** : lt elbow

**Evaluation Process** : Standard x-ray examination of the left elbow includes evaluation of the distal humerus and proximal radius and ulna as well as joint space. The presence of fracture, dislocation, erosive/lytic bony changes, soft tissue abnormality and calcification noted.

**Findings** : There is no evidence of fracture, bony tumor or other abnormalities noted. Incidental findings, if any, are described below.

**Impression** : NEGATIVE; NORMAL STUDY.

**[ DAVID A. SAKS, M.D.]**

**Date :** 08/30/2009

All Rights reserved to **Tech Care X-Ray**

**EXHIBIT**

J

Patient_Report

| | SFRC | | Date: 08/30/2009 |
|---|---|---|---|
| **Name** | : hamze abdelaziz | **Id #** | : I81379 |
| **Date of Birth** | : 4/23/1983 | **Date Ordered** | : 08/28/2009 |
| **Exam No** | : 4a8082809ah | **Ref. Physician** | : MIRANDER MD |
| **Date of Service** | : 08/28/2009 | **Technologist** | : MAXE ETIENNE |

**Exam** : Knee Right Complete

**Reason for Exam** : rt knee

**Evaluation Process** : Radiographic evaluation of the right knee includes bone density, joint compartments, evaluation of degenerative changes including osteophyte formation, joint space narrowing, loose body formation, effusion, abnormal calcification and fractures

**Findings** : There is no evidence of fracture, bony tumor or other abnormalities noted. Incidental findings, if any, are described below.

**Impression** : NEGATIVE; NORMAL STUDY.

**[ DAVID A. SAKS, M.D.]**

**Date :** 08/30/2009

All Rights reserved to **Tech Care X-Ray**

AH000093

STATE OF FLORIDA

DEPARTMENT OF CORRECTIONS
PRE-SPECIAL HOUSING HEALTH ASSESSMENT

| Institution: SFRC | | | Date: 8 28 09 | | | Time: 1050 |
|---|---|---|---|---|---|---|
| Use of force? Yes ☐ No ☒ | M | S | W | T | I | SD |
| If yes, also complete DC4-701C. | | | | | | |

Is inmate demonstrating strange/bizarre or threatening/engaging in self-harmful behavior? Yes ☐ No ☒
If yes, describe:

Current Medical Complaint? Yes ☐ No ☒ If yes, describe condition and treatment:
N/A

Vital Signs:
T: 97 P: 62 R: 17 BP: 112/7 Wt: 160    Allergies (list): NOO

Infirmities or impairment? Yes ☐ No ☒ If yes, list findings:

Medications? Yes ☒ No ☐

| List Current Medications (include psychotropics): | Dose | Frequency | Renewal Y | Renewal N | Pending Appointments (per inmate) |
|---|---|---|---|---|---|
| Ibuprophen | 800mg | BID/PRN | | X | Dental: Date: N/A |
| | | | | | Mental Health: |
| | | | | | Chronic Clinic: Yes ☐ No ☒ TYPE: N/A |
| | | | | | |

Arrangements for Medication Administration:
Self ___ Health Care Staff ___ NA ___

Inmate medication delivered to health care staff? Yes ☐ No ☒
If no, disposition:

Special Appointments: N/A

Dx Studies: N/A

Are there any apparent acute medical/mental health reasons that preclude placement in special housing?
Yes ☐ No ☒ If yes, explain on back, refer inmate to clinic.

Place any other pertinent information on back.
Health Record Reviewed? Yes ☒ No ☐
Inmate advised of how to access medical, dental, and mental health care? Yes ☒ No ☐
Mental Health Referral via DC4-529 (S2/S/3)? Yes ☐ No ☐ N/A ☒

Staff member signature, title and name stamp: Hernandez/KEanandz LPN
SFRC

Inmate Name Hemzel, Abdelaziz
DC# L81374  Race/Sex M/m
Date of Birth 04/23/83
Institution SFRC

This form is not to be amended, revised, or altered without approval
of the Deputy Assistant Secretary of Health Services Administration.

DC4-769 (Revised 12/05) Page 1 of 2


EXHIBIT
K

STATE OF FLORIDA

DEPARTMENT OF CORRECTIONS
PRE-SPECIAL HOUSING HEALTH ASSESSMENT

| Institution: CFRC | | | Date: 8/29/9 | | Time: 2450 | |
|---|---|---|---|---|---|---|
| Use of force? Yes ☐ No ☐ | M | S | W | T | I | SD |
| If yes, also complete DC4-701C. | new gain | | | | | |

Is inmate demonstrating strange/bizarre or threatening/engaging in self-harmful behavior?   Yes ☐   No ☒
If yes, describe:

Current Medical Complaint? Yes ☐   No ☑   If yes, describe condition and treatment:

Vital Signs: 976 PA
T: 97.8 P: 47 R: 16 BP: 113/82 Wt: 159   Allergies (list): of wood

Infirmities or impairment? Yes ☐   No ☑   If yes, list findings:

Medications? Yes ☑   No ☐

| List Current Medications (include psychotropics): | Dose | Frequency | Renewal Y | Renewal N | Pending Appointments (per inmate) | | |
|---|---|---|---|---|---|---|---|
| Ibuprofen OTC | | | | | Dental: | Date: 9/3/09 | N/A |
| | | | | | Mental Health: 9/2/09 | | |
| | | | | | Chronic Clinic: Yes ☐   No ☑ TYPE: | | |
| | | | | | | | |
| | | | | | | | |

Arrangements for Medication Administration:
Self X  Health Care Staff _____ NA _____

Special Appointments: Ø

Inmate medication delivered to health care staff?   Yes ☐   No ☑
If no, disposition:

Dx Studies: Ø

Are there any apparent acute medical/mental health reasons that preclude placement in special housing?
Yes ☐   No ☑   If yes, explain on back, refer inmate to clinic.
Place any other pertinent information on back.
Health Record Reviewed? Yes ☑   No ☐
Inmate advised of how to access medical, dental, and mental health care? Yes ☑   No ☐
Mental Health Referral via DC4-529 (S2/S3)? Yes ☐   No ☐   N/A ☐

Staff member signature, title and name stamp: Clow PN

Inmate Name Yamne, Abdelaaiz
DC# D61379   Race/Sex W/M
Date of Birth 4/23/83
Institution CFRC

This form is not to be amended, revised, or altered without approval of the Deputy Assistant Secretary of Health Services Administration.

DC4-769 (Revised 12/05) Page 1 of 2

AH000082

**FLORIDA DEPARTMENT OF CORRECTIONS**
## Chronological Record of Health Care

Allergies:

| DATE/TIME | |
|---|---|
| 8/28/09 10⁰⁰ | 1/1 Reports sustained trauma received from 2 officers stabe reported to Ⓡ wrist, Ⓒ face, Ⓡ temple & occiput, Ⓒ elbow, Ⓒ rib cage Ⓒ knee |
| (1) | Most discomfort related to Ⓒ elbow especially with movement.<br>Deny LOC, Ⓞ visual Δ, Ⓞ bleeding from ENT. Deny N/V.<br>Suggest overuse / jett or if eyes jumping |
| NOT O⃝ 8/28/09 10/09 80 | O. A × 0 × 3<br>in no apparent distress.<br>Face symmetric - Ⓒ cheek area mild/very thin Ⓒ swollen Ⓒ tender<br>Ⓡ temple & super ficia'l bruising<br>Ⓡ Occiput 1 cm cystine/c bruise) area<br>PERL Event: V/A: 20/25 Bil Ⓞ<br>Cervical N 11-12 feet<br>Neck supple<br>Chest symmetric - Ⓒ tender to A-P compress Ⓞ tender to side-side compression<br>+ superficial bruising to Ⓒ flank area Ⓒ bruise<br>ABD flat, Ⓝ Pain, Ⓞ tender<br>MS Ⓒ swelling, Ⓒ edema Ⓒ tender to touch<br>extends the elbow / pronate/ supinate w/o wd<br>Ⓒ knee superficial bruise - resolved over knee<br>GMT: normal   superficial bruise Ⓡ wrist |

Inmate Name Hamze, Abdelaziz
DC# L81379   Race/Sex W/M
Date of Birth 04/23/83
Institution SHC

S- Subjective Data
O- Objective Data
A- Assessment of S and O Data
P- Plan

This form is not to be amended, revised, or altered without approval
of the Director of Health Services Administration.

DC4-701 (Revised 5/07)


EXHIBIT
L

## FLORIDA DEPARTMENT OF CORRECTIONS
## Chronological Record of Health Care

Allergies:

| DATE/TIME | |
|---|---|
| | Neuro no focal Deficit |
| (11) | A. Soft tissue Injuries multiple area |
| | P. Xray (1) elbow |
| | (2) Knee |
| | Transfer to Bell 798 L para jim x 5 day |
| | Frell wound care occiput (R) wrist/knee |
| | Follow Flp plan |
| | 10/23/09 |
| | 0300 |
| | DR. M. MIRANDER, CHO |
| | SFRC |

Inmate Name __Hamze, Abdelaziz__
DC# __C81379__   Race/Sex __(W) M__
Date of Birth __04/23/83__
Institution __SFRC__

S- Subjective Data
O- Objective Data
A- Assessment of S and O Data
P- Plan
E-Education

This form is not to be amended, revised, or altered without approval
by the Office of Health Services-Administration

DC4-701 (Revised 10/31/08)

AH000085

```
1                    E R R A T A   S H E E T

2              This is to certify that I, ABDELAZIZ HAMZE, have
     read the foregoing transcription of my testimony In Re:
3    ABDELAZIZ HAMZE vs. SGT. JOHN DOE, ET AL, given on June 24,
     2013, and find the same to be a true and correct transcription
4    of said testimony with the following changes (if any):

5    PAGE   LINE   SHOULD READ:

6     20     9     I had a kufi cap on

7     20     25    August 28th instead of 8th

8     25     2     Nothing

9     26     1-2   to ha

10    29     24    Ammhmm  Yes

11    36     24    Ammhmm  Yes

12    41     3-4   But I didn't - going. (should be crossed)

13    41     10    Osteen Alston

14    41     19     //    //

15    44     12    But no need to tell everyone

16    ___  ___   _____

17    ___  ___   _____

18    ___  ___   _____

19    ___  ___   _____

20    ___  ___   _____

21    ___  ___   _____

22    ___  ___   _____

23

24                          _____

25                          ABDELAZIZ BILAL HAMZE
```

**EXHIBIT**

M

LEBLANC COURT REPORTING SERVICES, INC.
P.O. BOX 5907  GAINESVILLE, FLORIDA 32627  352-373-6030

1

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                   CASE NO. 11-21227-CIV--LENARD

 3

 4    ABDELAZIZ BILAL HAMZE,

 5                     Plaintiff,

 6    vs.

 7    SGT. JOHN DOE, ET AL.,

 8                     Defendants.
                                                          /
 9    STATE OF FLORIDA     )

10    COUNTY OF ALACHUA     )

11

12            Deposition of ABDELAZIZ BILAL HAMZE, taken on behalf

13    of the Defendants herein, pursuant to Notice of Taking

14    Deposition, at 7819 Northwest 228th Street, Union Correctional

15    Institution, Raiford, Florida, on Monday, June 24, 2013, at

16    11:30 a.m., before STEVEN E. LeBLANC, SR., RPR, Notary Public

17    in and for the State of Florida at Large.

18                      _  _  _

19    APPEARANCES:

20            ABDELAZIZ BILAL HAMZE, Pro se, 7819 Northwest 228th

21    Street, Union Correctional Institution, Raiford, Florida

22    32026, Plaintiff.

23            KATHLEEN M. SAVOR, ESQ., Office of the Attorney

24    General, 110 Southeast 6th Street, Suite 10, Fort Lauderdale,

25    Florida 33301, appeared on behalf of the Defendants.
```

EXHIBIT

N

LEBLANC COURT REPORTING SERVICES, INC.
P.O. BOX 5907 .GAINESVILLE, FLORIDA 32627  352-373-6030

2

```
 1                              - - -

 2                          I N D E X

 3    WITNESS:                                         PAGE:

 4

 5    ABDELAZIZ BILAL HAMZE

 6

 7        Direct Examination by Ms. Savor               3

 8

 9                              - - -

10                           EXHIBITS

11    DEPOSITION EXHIBIT                  FOR IDENTIFICATION

12     None

13

14

15

16

17

18

19

20

21

22

23

24

25    Certificate of Reporter                           47
```

LEBLANC COURT REPORTING SERVICES, INC.
P.O. BOX 5907  GAINESVILLE, FLORIDA 32627  352-373-6030

```
 1    Thereupon,
 2                        ABDELAZIZ BILAL HAMZE,
 3    having been produced and first duly sworn, testified as
 4    follows:
 5                        DIRECT EXAMINATION
 6    BY MS. SAVOR:
 7         Q.   I'm Kathleen Savor.  I'm the Assistant Attorney
 8    General representing Defendant Williams in this case.  We'll
 9    start with basics.  Why don't you go ahead and say your name
10    for the record.
11         A.   My last name is Hamze, H-a-m-z-e.
12         Q.   All right.  And your first name?
13         A.   Abdelaziz, A-b-d-e-l-a-z-i-z.
14         Q.   Have you ever had your deposition taken before?
15         A.   Uh, I had, yes.
16         Q.   Okay.  And when did you have your deposition taken
17    before?
18         A.   A different case on 2007.
19         Q.   Was it a civil suit or criminal?
20         A.   Criminal.
21         Q.   Your criminal case?
22         A.   Yes.
23         Q.   Okay.  So I will just go over some basics.  I'm
24    going to ask you some questions.  The court reporter here is
25    going to take down everything that both you and I say so he is
```

```
 1    going to - you need to speak up when you answer.  If he can't
 2    understand us, he's going to tell us he can't hear us or he
 3    can't understand what we're saying.  A few ground rules.  We
 4    don't want to speak over each other.  If we do, he's not going
 5    to be able to get it down.  He's good at what he does, but I
 6    don't think he's that good.  Not to knock you for what you do,
 7    but we'll just be careful about that.  You also can't - you
 8    have to give verbal responses.  If you shake your head or
 9    shrug your shoulders, he's not going to be able to get that
10    kind of response down.  If you don't understand the question
11    I'm asking, just tell me and I'll rephrase it again.  Okay?
12         A.    Mm-hmm.
13         Q.    Where are you currently residing?
14         A.    U Dorm at this camp.
15         Q.    What is this camp?  What's the name of this camp?
16         A.    Union CI.
17         Q.    And how long have you been at Union CI?
18         A.    Since March 28th, 2013.  But I have been here before
19    though.
20         Q.    All right.  Is this your first incarceration with
21    the Florida Department of Corrections?
22         A.    Yes.
23         Q.    Okay.  And what was the date of your incarceration?
24    When did you first come into the custody of the Department of
25    Corrections?
```

```
1        A.    August 13th, 2009.

2        Q.    And where were you located in August of 2009?

3        A.    South Florida Reception Center.

4        Q.    All right.

5        A.    In K Dorm.

6        Q.    And how long is your - What's your sentence?   How

7    long is it?

8        A.    30 years.

9        Q.    30?

10       A.    Yes.

11       Q.    And you stated earlier this is your first

12   incarceration?  You have never been incarcerated with the

13   Department of Corrections before here in Florida?

14       A.    Never.

15       Q.    Okay.  Have you been incarcerated in any other

16   state?

17       A.    No.

18       Q.    Okay.  What's your highest level of education that

19   you have received?

20       A.    I have - I finished one semester on my Master's

21   Degree.

22       Q.    A master's.  And what were you trying to get a

23   master's in what?

24       A.    Economics.

25       Q.    And where were you getting that Master's Degree?
```

1      A.    Florida Atlantic University.

2      Q.    Did get a Bachelor's of Art or Science Degree?

3      A.    Yes.

4      Q.    And where did you get that?

5      A.    FAU.

6      Q.    And what year did get that Bachelor's Degree?

7      A.    I remember 2004 or 5.

8      Q.    Before being incarcerated, did you have a job?

9      A.    I was self-employed.

10     Q.    All right.  When you say self-employed, what did you

11 do?

12     A.    I was selling electronics and cell phones, but I

13 didn't do it for a long time.  Just a couple, few months.

14     Q.    Besides being self-employed for a short period of

15 time, have you ever had a job?

16     A.    Not self-employed?  Yeah.  Yes.

17     Q.    All right.  And where have you worked?

18     A.    The last thing was at FAU as a teacher's

19 assistant.

20     Q.    Were you born here in the United States?

21     A.    Yes.

22     Q.    Teaching assistant.  Any other job besides teaching

23 assistant?

24     A.    Before that.  I had a job before that.

25     Q.    Okay.  And what kind of jobs did you have?

1       A.      Uhm, mostly mechanic for cars.  Car mechanic.

2       Q.      Have you ever been married?

3       A.      No.

4       Q.      Any children?

5       A.      No.

6       Q.      Before coming to South Florida Reception Center in

7   August of 2009, were you held in Miami Dade County or

8   Broward?

9       A.      Broward.

10      Q.      In Broward.  And how long were you held in

11  Broward?

12      A.      Two years and a few months.

13      Q.      When you arrived at South Florida Reception Center

14  in August of 2009, were you taking any medication?

15      A.      No.

16      Q.      During your time in Broward, the two years that you

17  were there, did you take any medication?

18      A.      Yes, but occasionally like antibiotics and pain

19  meds.

20      Q.      Okay.  And that's what I was going to ask you.  So

21  medical medications like antibiotics?

22      A.      Yes.

23      Q.      Okay.  And before arriving in the custody of either

24  Broward, the Broward County Jail or South Florida Reception

25  Center, had you ever taken any type of medications for any

1    mental health issues?

2         A.    Never.

3         Q.    Okay.  Did you ever see a doctor for any mental

4    health issues?

5         A.    Did or do I?

6         Q.    Did you ever?  Before arriving in the custody of the

7    Department of Corrections, had you ever seen a doctor for any

8    mental health issues?

9         A.    No.

10        Q.    Uhm, the 30 years that you got, and I think you put

11   it in your complaint, that was for vehicular manslaughter?

12        A.    Yes.

13        Q.    Okay.  And was that a car accident that happened in

14   Broward County?

15        A.    Well, that's part of my criminal case.

16        Q.    Right.  That's what I'm asking.  It was a vehicular

17   in Broward County?  It was vehicle --

18        A.    Yes.

19        Q.    Okay.  Now, you stated, and I'm looking at your

20   complaint, you amended the complaint?

21        A.    Well, the operational document should be 45.

22        Q.    Right.  Exactly.  All right.  So why don't you --

23   Let's go back to the date when you were at South Florida

24   Reception Center.  You were placed in K Dorm.  Is that the

25   only dorm you were in while you were at South Florida

```
1    Reception Center?

2         A.    Yes.

3         Q.    Okay. And why don't you tell me --

4         A.    Actually, I stayed one day in a different dorm. I

5    think the E Dorm, but that was just before I left.

6         Q.    Okay. All right. But most of your stay when you

7    arrived there you were placed in K Dorm?

8         A.    Yes.

9         Q.    Is that a two man cell or open bay?

10        A.    Two man cell.

11        Q.    Okay. Were you sharing your cell with anyone?

12        A.    Roommates.

13        Q.    All right. When you say "roommates", how many?

14        A.    I had one roommate at that time, but more than one

15   because they left and another one came.

16        Q.    All right. So you arrived in DOC custody in August

17   and how long were you in K Dorm?

18        A.    About two weeks.

19        Q.    And then you got moved out of South Florida

20   Reception Center?

21        A.    To E Dorm, then out of South Florida Reception

22   Center.

23        Q.    All right. And you went to Hamilton?

24        A.    Yes.

25        Q.    Okay. So when you arrived on August the 13th, tell
```

10

1     me what happened in your complaint or what you're alleging

2     happened to you?

3          A.    I'll answer your questions.  I mean, there's a lot

4     of things that happened from August 13th to --

5          Q.    Okay.  Well, in your complaint you state that on,

6     uhm, August 28th you were called to the officers' station; is

7     that correct?

8          A.    Mm-hmm.  Yes.

9          Q.    All right.  So when you say -- It's a two man cell.

10    Do you know what kind of a dorm K Dorm is?  Do you know if

11    it's a T Dorm?  A butterfly dorm?  Are you familiar with those

12    words at all?

13         A.    It's not a T Dorm.

14         Q.    Okay.

15         A.    And it's not a butterfly dorm.  It's a two wing

16    dorm.

17         Q.    Two wing dorm.  All right.  More like an H?  Like

18    shaped like an H?

19         A.    Yes.

20         Q.    So the officers' station is in the center?

21         A.    Mm-hmm.

22         Q.    Okay.  Is there glass around the officers'

23    station?

24         A.    Yes, but it's tinted so you can't see inside.

25         Q.    You can't see inside, but they can see out?

1       A.   Yes.

2       Q.   All right.  So you have here on August 28th around

3   12:15 in the morning your door was opened and you were called

4   out.  What were you doing at that time when you were called

5   out?

6       A.   Laying down.

7       Q.   Were you sleeping?

8       A.   No.

9       Q.   And what - do you know the name of the inmate that

10  you shared a cell with that day?

11      A.   Hill.

12      Q.   Last name Hill?

13      A.   Mm-hmm.

14      Q.   Do you know his first name?

15      A.   No.

16      Q.   Do you know why you were called out?

17      A.   I found out later that it was for the purpose of

18  being hit.

19      Q.   Well, when they came and they called you out, what

20  did they say?

21      A.   They say come down to the officers' station.

22      Q.   And who called you out?

23      A.   Officer Johnson.

24      Q.   And is Officer Johnson white, African-American,

25  Hispanic?  What is he?

1        A.   He's African-American and he's very fat.  And male

2    African-American, very fat, about 450 pounds.  400.

3        Q.   Now, when he asked you to go to the officers'

4    station, were you handcuffed?

5        A.   No.

6        Q.   And he came to your cell and opened it?

7        A.   No.  He popped the door.

8        Q.   Okay.

9        A.   When I came out of my cell, he waved for me with his

10   hand to come down.

11       Q.   Where was he located?

12       A.   Inside the officers' station.

13       Q.   Inside the officers' station.  So he popped your

14   door and how did you hear him yell for you?

15       A.   No.  I hear my door click.

16       Q.   Right.  Well, how do you know that he wanted you and

17   not Hill?

18       A.   Because he kept pushing the button and when I came

19   out, he - you can see - from the door you can see the door of

20   the officers' station.  When I came out of my cell, I stood by

21   there.  He stepped out of the officers' station and stood by

22   the door, but he was, you know, still on the door of the

23   officers' station and he told me to come down with his hand.

24       Q.   Now, Officer Johnson - at the time this happened had

25   Officer Johnson been working in that dorm?

```
 1        A.    Yes.

 2        Q.    And what shift did Officer Johnson work?

 3        A.    At that time the shift that goes from four to

 4   twelve.

 5        Q.    And the four to twelve shift, how many officers are

 6   in K Dorm on any given night?

 7        A.    Usually three, one sergeant, two officers.

 8        Q.    All right.  So Officer Johnson was at the door of

 9   the officers' station, not in the officers' station?

10        A.    He was in it, but he stepped - he came to the door

11   so that I can see him.  He opened the door and he waved for

12   me.

13        Q.    All right.

14        A.    Initially he was in it.

15        Q.    So he popped your door and you kept hearing clicking

16   sounds?

17        A.    Mm-hmm.

18        Q.    So you didn't hear anybody call your name, you just

19   heard a clicking sound?

20        A.    Yeah.

21        Q.    And you got up from your bunk?

22        A.    Mm-hmm.

23        Q.    And you went to the door?

24        A.    Mm-hmm.

25        Q.    And Officer Johnson then went to the officers'
```

1     station door and said?

2          A.    He waved for me with his hand to come down.

3          Q.    Okay.  And when he says come down, were you on the

4     first floor or the second floor?

5          A.    Second floor.

6          Q.    Was there any other officers within the wing where

7     you were when you stepped out of your cell?

8          A.    They were in the officers' station.

9          Q.    So all - were there three officers in the officers'

10    station?

11         A.    There were four altogether.

12         Q.    There were four officers.  Do you know who the other

13    officers were?

14         A.    Yes.

15         Q.    And who were they?

16         A.    Sergeant Williams, Sergeant Goldberg.

17         Q.    I'm sorry.  That last name was?

18         A.    Goldberg.

19         Q.    Goldberg.  Okay.

20         A.    Officer Rodriguez and Officer Johnson.

21         Q.    Now, Sergeant Williams, uhm, do you know, male,

22    female?

23         A.    He's a black male.

24         Q.    And Sergeant Goldberg?

25         A.    White female.

15

1        Q.    And Officer Rodriguez?

2        A.    Hispanic male and Johnson I already told you.

3        Q.    Now, when you stepped out of your cell and you have

4    Officer Johnson asking you to come to the officers' station,

5    did you see the three other officers in the officers'

6    station?

7        A.    No.

8        Q.    And when you got to the officers' station, what did

9    you do?

10       A.    Well, first I didn't come out of the dorm because

11   you have to get out of the dorm to go in the officers'

12   station.  I went down to the officers' station flap, asked him

13   what's up.  He say come out and come in the officers' station.

14   I told him, you know, why do you want me to do that?  But he

15   didn't answer.  He just said come on.  I need to talk to you.

16   Or he said we need to talk to you.  Something like talking to

17   me.

18       Q.    All right.

19       A.    So I went out and I stepped in front of the door and

20   he say come in.  So I came in after, you know, hesitating

21   because it's not usual for the inmates to come in the

22   officers' station.

23       Q.    Okay.  And then what happened?

24       A.    I asked him why do you want me to come in?  He said,

25   just come in.  We need to talk to you.  So I came in and they

16

1    closed the door.

2        Q.    Okay.  And then what happened?

3        A.    When they closed the door, I turned, I found Officer

4    Rodriguez had been squatting underneath the door and also

5    Williams was also telling me to come in.  Sergeant Williams.

6        Q.    Okay.  Then what happened?

7        A.    And then Officer Rodriguez, he punched me in the

8    back of my head very forcefully.

9        Q.    So Officer Rodriguez punched you in the back of your

10   head?

11       A.    Yeah.

12       Q.    And then what happened?

13       A.    Then Sergeant Williams, he attacked, he came

14   attacking me and he punched me also in my head.

15       Q.    Sergeant Williams?

16       A.    Sergeant Williams.

17       Q.    All right.  And then what happened?

18       A.    They kept punching me on my head and then I fell on

19   the ground.  I guess I lost balance and they start kicking me

20   and punching me.

21       Q.    Do you know why they would call you into the

22   officers' station and do this?

23       A.    I can only guess.

24       Q.    And what's your guess?

25       A.    Either because of my nationality or something like

1      that.

2          Q.   And what's your nationality?

3          A.   They know I'm from, originally the Middle East.

4          Q.   Well, I asked you if you were born in the United

5      States?

6          A.   See, I'm telling you about my nationality, my

7      race.

8          Q.   Well, I understand that, but your nationality, you

9      were born in the United States?

10         A.   Yes.  I was born here.

11         Q.   So you're an American?

12         A.   I am an American.

13         Q.   Okay.  But you're saying they targeted you because

14     of your parents' nationality?  Are your parents from

15     America?

16         A.   They were born overseas.

17         Q.   Okay.  So they were born overseas.  You were born

18     here in America?

19         A.   I guess I'm saying because of my race.

20         Q.   Because of your race?

21         A.   Yeah.

22         Q.   And your race is Middle East?

23         A.   Yes.

24         Q.   And your parents you say were born in the Middle

25     East and came over here?

18

1      A.    Yeah.

2      Q.    All right. And what country did your parents

3   originate from?

4      A.    Lebanon.

5      Q.    I'm sorry?

6      A.    Lebanon.

7      Q.    Okay. Did they ever make any comments about your

8   race?

9      A.    Not during then, no.

10     Q.    Well, you say not during. When did they make

11  comments about your race?

12     A.    Sergeant Goldberg, I heard her say, make comments

13  about my, you know, heritage earlier, a few, like maybe a week

14  earlier, or less than a week.

15     Q.    All right. And what did she say?

16     A.    She said we don't like you, all you, like people

17  from my background.

18     Q.    And she said that before this attack?

19     A.    Yeah.

20     Q.    All right. And do you know why she would say that

21  to you?

22     A.    Because I told you. Because, you know, they don't

23  like me.

24     Q.    Have you ever - did you ever before this incident

25  and besides her saying that to you, did you have a

19

1    conversation with her?

2         A.   No.

3         Q.   Looking at you how would she know you're from the

4    Middle East?

5         A.   Because first of all, I had my accent.  Second of

6    all, I had a cap on my head.  Third of all, she can get it

7    from the inmates or anybody or just by looking at my name she

8    can guess.

9         Q.   So it's someone guessing.  But other than that you

10   never had a conversation with her?

11        A.   No.  No.  It's not just guessing.  She knew.

12        Q.   How do you know she knew?

13        A.   Because she told me, we don't like you, all the

14   people from over there.

15        Q.   Well, you're not from over there.  You're from here.

16        A.   Okay.  But --

17        Q.   You're from America so I'm trying to get this.

18        A.   She didn't know that.  She didn't know that.

19        Q.   Well, that's what I'm saying.  How would she know?

20   Because it's not true.  You're not from over there.

21        A.   I am from over there.  I just told you my parents

22   come from over there.

23        Q.   But you're not?

24        A.   Hmm?

25        Q.   You're not.  You were born here in America.  I

1    understand what you're saying.  You have a nationality.  Your

2    parents nationality is Lebanon.  I get that.  But you're from

3    America, right?

4         A.    Mm-hmm.

5         Q.    You were born here in the United States.  What state

6    were you born in?

7         A.    Florida.

8         Q.    Okay.  So you're a Floridian like I'm a Floridian.

9         A.    Mm-hmm.

10        Q.    Were born here in the United States.  But aside from

11   her - you making the statement that you wore a cap on your

12   head?

13        A.    Yeah.

14        Q.    Okay.  Uhm, an accent?

15        A.    Right.

16        Q.    You never spoke with her directly though.  It's all

17   through other inmates.  You spoke to other inmates and they

18   knew that you have an accent?

19        A.    She can hear my accent, too.

20        Q.    Okay.  How often did Sergeant Goldberg work in K

21   Dorm?

22        A.    She wasn't working in K Dorm, but she came to K Dorm

23   just to witness and supervise my violation.

24        Q.    Okay.  But I'm talking about before this violation,

25   what happened to you on August 8th, what you claim happened,

1    before when she made the comment we don't like you here --

2         A.    Mm-hmm.

3         Q.    -- when would you have come in contact with her or

4    around her that she even saw you?

5         A.    I was - I was on my way back from the yard.

6         Q.    And where was she working?

7         A.    I guess she was supervising the yard.

8         Q.    Okay.  Did you go to the yard daily?

9         A.    To her what?

10        Q.    Did you go to the yard daily?  Did you go to the

11   yard?

12        A.    Yes.

13        Q.    All right.  And would you see her daily in the

14   yard?

15        A.    No.  Not daily.  I see her almost daily on my way to

16   chow hall and to the yard.  I guess she takes a few days

17   off.

18        Q.    And how about Officer Rodriguez.  Did you have any

19   conversations with Officer Rodriguez before this date?

20        A.    Yes.

21        Q.    The August 28th.  When did you have conversations

22   with him?

23        A.    Not conversations.  Just asking him, you know,

24   questions, you know.

25        Q.    Did he work in K Dorm?

```
 1          A.    I don't think so.
 2          Q.    Okay.  And Sergeant Williams, did he work in K
 3     Dorm?
 4          A.    I don't think so.
 5          Q.    Do you ever remember seeing Officer Rodriguez in K
 6     Dorm before August 28th?
 7          A.    Yes.
 8          Q.    And what was he doing in K Dorm?
 9          A.    Again, he was supervising inmates, control job.
10          Q.    Okay.  So he was working in K Dorm?
11          A.    Mm-hmm.
12          Q.    And Sergeant Williams you have never seen in K
13     Dorm?
14          A.    I have seen him in K Dorm before.
15          Q.    So he was working in K Dorm?
16          A.    No.  I didn't say that.  I said I have seen him in K
17     Dorm before.
18          Q.    But not working in K Dorm, just coming in and
19     leaving?
20          A.    I think so.  I think he doesn't work in K Dorm.
21          Q.    At the time on August 28th had you been assigned any
22     job to do when you were there at South Florida?
23          A.    No.
24          Q.    So no assigned job.  So pretty much your day was
25     waking up, going to different appointments?
```

1       A.    Yeah.  That's what I did.

2       Q.    And yard when they had yard time.  But you were

3    waiting for your assignment of your permanent institution

4    where you were going to be sent?

5       A.    Yes.

6       Q.    Okay.  Officer Johnson, had you had any

7    conversations with Officer Johnson?

8       A.    Yes.

9       Q.    And what conversations did you have with Officer

10   Johnson?

11      A.    Well, I - I - I used to talk to him about, you know,

12   ask him questions about locations of buildings and appointment

13   times.

14      Q.    Did any of these officers, Rodriguez, Williams,

15   Goldberg or Johnson ever give you a disciplinary report before

16   this incident on August 28th?

17      A.    No.

18      Q.    Now, you talked about being brought into the room.

19   The door is shut.  You being hit by Officer Rodriguez who you

20   said was behind the door?

21      A.    Yes.

22      Q.    Okay.  And where did he, when you first got hit,

23   where did he hit you?

24      A.    On my head.  I told you.

25      Q.    All right.  The side of the head?  The back of the

```
1    head?

2         A.    The first hit was in the back.

3         Q.    In the back of the head?

4         A.    Yeah.

5         Q.    And then you stated Sergeant Williams then hit

6    you?

7         A.    Mm-hmm.

8         Q.    And where did Sergeant Williams hit you?

9         A.    Well, the side, left side of my head.

10        Q.    At the time when you were being hit, did Officer

11   Rodriguez before hitting you say anything to you?

12        A.    No.

13        Q.    Did Sergeant Williams say anything to you?

14        A.    Yes.  He said something.

15        Q.    What did he say?

16        A.    He say like a challenging statement.  Like what you

17   gonna do now?  Or something.  Or who you gonna fight?  Or who

18   you gonna smack or hit?

19        Q.    When you got hit by Officer Rodriguez, did you keep

20   standing still or what did you do?

21        A.    No.  It was a very strong hit.  I had to be swayed

22   by it.

23        Q.    But did you stay on your feet or did you go down?

24        A.    I went down after Sergeant Williams hit me.

25        Q.    Okay.  And then what happened once you went down
```

1    onto the ground?

2         A.    Nothing.  They came down and started kicking me

3    because there was a stairs.  I guess one of them at least took

4    the stairs and one of them jumped down and they start kicking

5    me and punching me while I'm on the floor.

6         Q.    Was anyone saying anything while you were on the

7    ground and they were kicking and hitting you?

8         A.    I remember hearing the voice of Sergeant Goldberg,

9    but that was just the beginning.

10        Q.    And what was Sergeant Goldberg saying?

11        A.    I guess she told them to attack me.  She -- It's not

12   audible very much because she said it in a low voice.

13        Q.    Did Sergeant Goldberg hit you or kick you?

14        A.    No.  She just watched.

15        Q.    And Officer Johnson?

16        A.    He was watching, too.

17        Q.    And how long were you being hit and kicked?

18        A.    One to two minutes.

19        Q.    And then how did it stop?

20        A.    Actually, it was more than one to two minutes.

21   Maybe two to three minutes.

22        Q.    And how did it stop?

23        A.    Well, I - I was on the floor and I got bruised and

24   swollen parts, lumps on my head and then they stopped after a

25   while.  I guess they get tired.  They get tired because they

1    were using their full force so they were panting like dogs, ha
2    ha.  You know what I'm saying?

3        Q.   Mm-hmm.  And then.what happened?

4        A.   I told you, they stopped after they get tired and
5    then they told me to get up on my feet.  I struggled because I
6    had injuries to my - they had kicked me somewhere on my thigh
7    and in my back, my back hip.  I struggled to get up on my
8    legs, but I eventually did.  And they said, well, they told me
9    that, you know, from now on -- Like they threatened me, right?
10   They say if you ever show any disrespect to anybody, also, or
11   say anything to Sergeant Goldberg or anything, they gonna do
12   it again.

13       Q.   And why would they say if you ever showed
14   disrespect?  Had you done anything that showed disrespect to
15   anybody before this date?

16       A.   I didn't, no.

17       Q.   So you had no idea what they were talking about?

18       A.   Well, it's obvious that she had lied on me
19   somehow.

20       Q.   But you have no idea?

21       A.   Or maybe - maybe they were just, you know, trying to
22   say things to aggravate a situation or stir up, you know, stir
23   up the situation again.

24       Q.   Now, did you go and seek medical help?

25       A.   Yes.

```
 1      Q.    When did you seek medical help?

 2      A.    Next morning.

 3      Q.    And how did you do that?

 4      A.    I walked to medical.  I walked to the colonel's

 5   office and then the colonel's office staff and the

 6   administrative lieutenant, they took me to medical.

 7      Q.    All right.  And you walked to the colonel's office.

 8   Why did you walk to the colonel's office?

 9      A.    To declare what happened to me.

10      Q.    Had you written a grievance?

11      A.    Yes.

12      Q.    And did you mail the grievance or did you turn the

13   grievance in?

14      A.    No.  I took the grievance with me to the colonel's

15   office the next morning and I handed it to the colonel.

16      Q.    And who was the colonel?

17      A.    The administrative sergeant.  Sorry.  I handed it to

18   the administrative sergeant.  The administrative sergeant

19   handed it to administrative lieutenant.  The administrative

20   lieutenant gave it to the colonel.

21      Q.    Okay.

22      A.    I don't know the name of the colonel.

23      Q.    And then you walked to medical or were you taken to

24   medical?

25      A.    They walked me to medical.
```

```
 1        Q.   Okay.  They walked you to medical.  And who did you
 2   see in medical?
 3        A.   The doctor and the nurses.
 4        Q.   Okay.  And were you treated for anything?
 5        A.   Yeah.
 6        Q.   All right.  What were your injuries?
 7        A.   I had bruises on my - I had lumps on my head.
 8   Bruises on my face.  Bruises on my body.  Like injuries, my
 9   hand cut.  My hand.  I had cuts on my knees.  I had a lot of
10   bruises on my thigh and hip.
11        Q.   Did you have any x-rays taken?
12        A.   Yeah.
13        Q.   What did you have x-rays taken of?
14        A.   Different body parts.  My ankles.  I'm sorry.  My
15   knees.  My elbows and I think my ribs.
16        Q.   Do you know what the findings were of any of those
17   x-rays?
18        A.   They didn't tell me that.
19        Q.   Okay.  Besides the next day going to medical, did
20   you go back for medical treatment after that day for these
21   injuries?
22        A.   Well, I was - after that I was taken to a different
23   camp and there I did sign up for treatment for these and I was
24   put on just some pain medicine.
25        Q.   And that was when you got to - you went to --
```

```
1        A.    Hamilton.

2        Q.    -- Central Florida Reception Center and then onto

3   Hamilton?

4        A.    Yeah.

5        Q.    So you got pain medication at Hamilton?

6        A.    Mm-hmm.

7        Q.    And how long were you on pain medication?

8        A.    They used to give me over the counter like pills.

9        Q.    Ibuprofen?

10       A.    Yeah, Ibuprofen.

11       Q.    And how long were you on Ibuprofen?

12       A.    It wasn't a prescription.  They just say you got to

13  get it from the officer, but they give me some in the

14  beginning and they say if you need more, get it from the

15  officer.

16       Q.    Okay.  Did you ever - once - you turned in a

17  grievance you said to the -- Well, it ended up getting to

18  administrative sergeant, then the lieutenant, and then the

19  colonel's office.  Did you ever speak to anybody else about

20  this.  Let me ask you this --

21       A.    The inspector.

22       Q.    The inspector.  Okay.  So there was an

23  investigation?

24       A.    Mm-hmm.

25       Q.    Do you remember the inspector's name?
```

```
1          A.    No.

2          Q.    And did the inspector come and see you in Hamilton

3    or --

4          A.    Yes.

5          Q.    And at that time was the incident --

6          A.    No.  No.  The inspector came to see me at SFRC.

7          Q.    Okay.  So before you ever got moved out to Hamilton

8    --

9          A.    Yeah.

10         Q.    -- you saw an investigator?

11         A.    An inspector.

12         Q.    An inspector.  Okay.  And he asked you what

13   happened?

14         A.    Yes.

15         Q.    Okay.  And you wrote a statement as to what

16   happened?

17         A.    Not - not me.  The administrative lieutenant, he

18   wrote down everything I said.

19         Q.    Okay.

20         A.    But that was before the inspector.  The inspector

21   had a tape recorder with him.

22         Q.    And you gave the inspector a scenario of what

23   happened?

24         A.    Mm-hmm.

25         Q.    All right.  Would it be possible that, I mean, today
```

1    you're talking about Sergeant Williams and Sergeant Rodriguez,
2    Officer Rodriguez hitting you.  Would it be possible that you
3    told the investigator that it was Officer Rodriguez and
4    Officer Johnson that hit you and Officer Williams was just
5    watching?
6         A.   No.  He gave me - he showed me a picture of Sergeant
7    Williams and I told him that's the - that dude did hit me.
8         Q.   All right.
9         A.   I pointed to his picture so he knew exactly who I'm
10   talking about.  There was no mistake.
11        Q.   All right.  So the person in the picture that you
12   identified, you're saying, you claimed that that is the one
13   who hit you?
14        A.   One of them, yes.
15        Q.   And you believe that to be Sergeant Williams?
16        A.   I know it's Sergeant Williams.
17        Q.   And why do you know it's Sergeant Williams?
18        A.   Because I have seen his picture.
19        Q.   So if the investigator's report says that you
20   identified Officer Johnson, you're now saying no, that's not
21   right.  That picture is Williams?
22        A.   I told him about all four of them.
23        Q.   You identified all four?
24        A.   No.  He didn't show me all the four pictures.  He
25   showed me the picture of Goldberg and the picture of Sergeant

1     Williams and I told him that about Officer Johnson.   I

2     described Officer Johnson to him exactly and I described

3     Officer Rodriguez to him exactly.   But he didn't show me

4     pictures of Officer Rodriguez and Officer Johnson.   He just

5     showed me a picture of a bald sergeant who has a mustache and

6     it was exactly Sergeant Williams.

7         Q.    So Sergeant Williams has a mustache?

8         A.    At that time.

9         Q.    At that time.   Did the picture have a mustache in

10    it?

11        A.    Yes.

12        Q.    And Sergeant Johnson - or not sergeant - Officer

13    Johnson, excuse me, an African-American large man?

14        A.    Fat.

15        Q.    Was Sergeant Williams, how would you describe him

16    besides being African-American?

17        A.    Sergeant Williams is not -- Officer Johnson is not

18    just large.   He's very fat and he's - he's - yeah.   I mean,

19    you got to distinguish that from -- Sergeant Williams is

20    somewhat large, but not like Officer Johnson.   Sergeant

21    Williams you can say he's tallish and a little bit chubby.

22        Q.    But Officer Johnson is?

23        A.    Is maybe the fattest one in that camp.   I never seen

24    anybody fatter than him.

25        Q.    Now, you state in your complaint also that you were,

33

1    because of this happening it caused you a lot of stress and an
2    inability to adjust to the prison environment.  What do you
3    mean by that?
4         A.    I developed paranoia from the officers.  I couldn't,
5    you know, act normally.
6         Q.    Did you see any psychologist or psychiatrist there
7    at South Florida Reception Center after this incident?
8         A.    No.
9         Q.    Had you already seen a psychologist or psychiatrist
10   or been evaluated by the mental health department at South
11   Florida Reception Center before this incident?
12        A.    Yes.
13        Q.    And you never saw anyone after this incident at
14   South Florida Reception Center?
15        A.    No.
16        Q.    When you got to Hamilton, did you see anybody?
17        A.    I think I was evaluated by mental health.  No.  No.
18   Actually, at Hamilton I didn't see any mental health staff
19   except at cell front.  It wasn't like a serious evaluation.
20        Q.    All right.  And when you say cell front, when you
21   were placed in confinement?  What do you mean by cell front?
22        A.    Yeah.  After a while I was placed in confinement.
23        Q.    All right.  But after this event you said that you
24   became paranoid?
25        A.    Yes.

1       Q.     But you didn't seek help for that?

2       A.     Yes.   That's why I'm her at UCI.

3       Q.     Well, I understand that.   But this is - we're

4    talking 2009.   I'm not talking about 2013.   2009 though what

5    exactly - what were you experiencing?

6       A.     See, I had you can say very nervousness being around

7    the officers.   See what I'm saying?

8       Q.     Mm-hmm.

9       A.     And that affected my behavior.

10      Q.     And what do you mean by affected your behavior?

11   What happened with your behavior?

12      A.     Like I just became very nervous around the officers

13   and I couldn't like express myself as I'm supposed to and so I

14   have to avoid being around the officers as much as I can

15   because I was, you know, in fear of being attacked

16   involuntarily.

17      Q.     And you mentioned here at UCI you're currently in a

18   TCU unit; is that correct?

19      A.     Correct.

20      Q.     How long have you been in a TCU unit?

21      A.     Well, I have been on it since January 2012, but

22   I went to Corrections Mental Health Hospital in February 2013

23   and I came back in March 2013.   That was like emergency.

24      Q.     And when you say emergency, what happened?

25      A.     Well, they just said that the doctor - the doctor

35

1    here referred me for CMHI emergency.

2         Q.   How long were you at the CSU unit?

3         A.   CMHI?  One month.

4         Q.   Are you currently on any psychotropic medication?

5         A.   Not currently, no.

6         Q.   Have you since 2009 to today were you ever put on

7    any psychotropics?

8         A.   Oh, yeah.

9         Q.   When was the first time you were put on psychotropic

10   medications?

11        A.   Sometime in 2011 I remember.

12        Q.   When was the first time you saw anyone for your

13   paranoia after this August 28th incident?

14        A.   In Santa Rosa CI in 2011, I think.

15        Q.   Now, you have had, I can see from your worksheet,

16   you have had numerous disciplinary reports, correct?

17        A.   Yes.

18        Q.   And then you have been placed in close management?

19        A.   Mm-hmm.

20        Q.   Was Santa Rosa close management?

21        A.   Yes.

22        Q.   How long did you stay in close management?

23        A.   I'm still in close management.

24        Q.   You're still, but now in the TCU unit?

25        A.   Mm-hmm.

36

1      Q.    So if you get released from the TCU unit, you would
2      go back to close management?

3      A.    Yes.

4      Q.    Okay.  But before the August 28th incident, you had
5      not had any disciplinary reports?

6      A.    Say again.

7      Q.    Disciplinary reports.  Before the August 28th
8      incident, you had not had any disciplinary reports?

9      A.    Well, you asked me that.  I told you no.

10     Q.    Okay.  So the first disciplinary report was at
11     Hamilton in October?

12     A.    Mm-hmm.

13     Q.    Okay.

14     A.    Yes.

15     Q.    Do you have any -- Going back to the injuries,
16     you're not sure what they found in the x-rays.  No one ever
17     told you.  And you went to Hamilton and you did see some
18     doctors and they gave you the over the counter Ibuprofen.  Do
19     you see any of the medical for any of the injuries that you
20     received that day, do you still see any medical personnel for
21     anything?

22     A.    Not the physical injury.

23     Q.    Just the mental health?

24     A.    Mm-hmm.

25     Q.    Okay.  And you have talked about it took away your

1    ability to enjoy ordinary enjoyment of life.  So tell me
2    exactly about your day and what you can't do anymore or how it
3    affects you?
4         A.    Well, it's the ongoing anguish and mental pain.
5    It's obviously you can see.  You can see its affect on the
6    person.  It has a negative effect you would agree.
7         Q.    Well, what kind of things?  Okay.  Do you sleep at
8    night?
9         A.    Some.  I sleep at night, but not the way I'm
10   supposed to.
11        Q.    Okay.  And what do you mean by that?
12        A.    Well, I get up often and the total hours of sleep is
13   only like four hours or so.
14        Q.    And have they ever given you anything to help you
15   sleep at night?
16        A.    In the past, but it didn't help me so I stopped
17   taking it.  They took me off.
18        Q.    And what about eating, your diet?
19        A.    Well, currently I'm eating all my trays.
20        Q.    Okay.  What kind of things during the day were you
21   having problems with?  Well, let me ask you this:  When
22   you went to Hamilton, you were given a job in food service.
23   Were you able to work daily when you weren't in confinement?
24        A.    See, I was showing up, but I couldn't work like I
25   was supposed to.  I was always falling short.  Like, you know,

1    not having problem finishing job and getting, you know,

2    anxious, staying in one spot. And, of course, you know,

3    because I couldn't be because there's an officer or two at

4    least over there and that was part of the syndrome.

5         Q.   And you really haven't - you haven't worked since

6    Hamilton?

7         A.   No.

8         Q.   Since 2010 because you have either been in

9    confinement or close management?

10        A.   Mm-hmm.

11        Q.   Since 2010?

12        A.   Yes.

13        Q.   And they don't give you a job in TCU? You don't

14   work now?

15        A.   No.  We don't work.

16        Q.   Are you in group counseling or one on one

17   counseling?

18        A.   Both.

19        Q.   And you said you have been diagnosed -- Well, in the

20   complaint you wrote paranoia schizophrenia.  Have you been

21   diagnosed as schizophrenic?

22        A.   Well, the mental health, when I came to Union in

23   2012 they did that, yes.

24        Q.   After the incident in August 2009, did you ever

25   speak with any of those four officers?

```
1        A.    No.

2        Q.    They never came and talked to you, nothing?

3        A.    Nothing.

4        Q.    You had also - there was a grievance that was

5    written, uhm, and also some other statement that you thought

6    that the attack happened because the criminal act why you were

7    in prison, uhm, was the death of a prominent woman in Miami?

8        A.    In Broward County.

9        Q.    In Broward County.  And who exactly was that?

10       A.    The victim in my case.

11       Q.    Right.  It's a victim.  But when you made that

12   comment that these officers somehow knew what had happened to

13   this woman and that's why they beat you up that night?

14       A.    They knew what happened.  They knew about my case.

15       Q.    How did they know about your case?

16       A.    From Sergeant Williams.

17       Q.    And how did Sergeant Williams know about your

18   case?

19       A.    I guess it was so famous that he knew about it.

20       Q.    Who exactly was the victim in your case?

21       A.    It was an African-American woman.

22       Q.    Okay.  But it was famous?

23       A.    Yeah.

24       Q.    In Broward County?

25       A.    Yeah.  Yeah.  See, the case is very high profile.
```

1    It was on the news and nationwide.

2         Q.    That's what I'm saying.  Who was the victim?  I'm

3    from Broward.

4         A.    You're from Broward County?

5         Q.    Yeah.

6         A.    And you never heard of my case before?

7         Q.    No.  Who is the victim?

8         A.    I'm surprised.  The victim is -- You might not know

9    her, but you know about my case.  The victim is - her name is

10   Sandra Hall.

11        Q.    Sandra Hall?

12        A.    Yeah.  Regardless of whether she's famous or not,

13   the case was on the news extensively very much.

14        Q.    And you're saying Sergeant Williams knew this?

15        A.    Yes.  He knew that.

16        Q.    And how do you know Sergeant Williams knew it?

17        A.    Well, him and sergeant, another sergeant were

18   talking about it before.

19        Q.    And what day was that?

20        A.    It was like around August, say -- I can't remember

21   the exact date, but it had to be a couple of weeks or one to

22   two weeks before the incident.

23        Q.    And where were they speaking?  Where were they

24   talking?

25        A.    By the chow hall.

```
1       Q.   And what did you hear them say?
2       A.   Well, I - one other sergeant was saying that I ran
3   over, you know, a lady.  But I didn't stop because I didn't
4   want to aggravate the situation so I kept going.
5       Q.   All right.  So you heard Sergeant Williams tell
6   another officer that --
7       A.   No.  Another sergeant telling Sergeant Williams.
8       Q.   Another sergeant was telling Sergeant Williams.  You
9   don't know who the sergeant was?
10      A.   Olsteen.
11      Q.   Sergeant Olst?
12      A.   Olsteen.
13      Q.   And you heard Sergeant Olsteen telling Sergeant
14  Williams that you ran over a lady?
15      A.   Mm-hmm.
16      Q.   Just a lady?
17      A.   He said a lady, yeah.  He said that that's the guy
18  that ran over that lady.  That lady.  That means they knew
19  what they was talking about.
20      Q.   What year was your - what year was the crime
21  committed, in 2006?
22      A.   I was charged in 2007.
23      Q.   2007.  But what date did it happen?
24      A.   June 4th, 2007.  June 3rd.
25      Q.   June 3rd?
```

42

1       A.    Yeah.

2       Q.    Do you have any physical lingering effects from this

3   incident in August of 2009?

4       A.    How do you mean?

5       Q.    Physically?  Do you have any still lingering pains,

6   anything that you seek medical help for?

7       A.    I think I have a mark on my hand, but it's not - I'm

8   not seeking any treatment for that.

9       Q.    And aside from being in the -- And I want to talk

10  about before you have been in a TCU because I understand now

11  that you're in a TCU unit you're getting daily help, would

12  that be correct?

13      A.    Yeah.

14      Q.    But before that when you were in close management or

15  even in administrative confinement, wherever, how often were

16  you getting mental health?

17      A.    See, I wasn't.  When that happened, I wasn't

18  familiar with seeking mental treatment so I didn't just go

19  straight afterwards to seek mental health treatment.

20      Q.    You were at Florida State Prison back in January

21  2012 and what brought you to the TCU unit on January 26, 2012

22  here at Union?

23      A.    Well, I was seeking mental health treatment.

24      Q.    Did you call a psych emergency?

25      A.    Yes.

1       Q.   All right. And why did you call a psych

2    emergency?

3       A.   Well, that's all written in my mental health file.

4       Q.   Okay. So as we sit here today you are positive that

5    Sergeant Williams is the one that hit you along with Officer

6    Rodriguez on the day of the incident?

7       A.   Positive.

8       Q.   Okay. I have no further questions. You have a

9    right to read or waive the deposition. And that means he's

10   written everything down. I'm ordering a copy of the

11   deposition. Uhm, you are allowed to look through it and if

12   you think he wrote something down that's improper or incorrect

13   of what you said, there's what's called an errata sheet on the

14   back page and you're allowed to make any corrections that you

15   think was not taken down correctly. Do you want to read or do

16   you want to waive?

17      A.   No. I want to read.

18      Q.   Okay. Now, you understand if you want a copy of the

19   deposition, you have to order it from him. He makes a living

20   and I have to pay for a depo just like you would. So you're

21   only going to get to read it and then it's going to be

22   returned right back. You don't get to keep a copy of it

23   unless you pay him for a copy of the depo.

24      A.   Well, I make corrections to it and I send it back to

25   him, right?

44

1     Q.   Well, what I'll do is, I'm ordering one so I'm going
2   to get a copy.  I'm paying for one.  I will make arrangements
3   with your classification officer that she will sit down, he or
4   she, I don't know who it is, and they will let you sit in a
5   room and read it and make corrections.  You're going to give
6   it back to her.  She's going to mail it to me and I'll get the
7   corrections to him.
8     A.   Well, that's not a convenient way because that will
9   expose them to too much information.
10     Q.   Well, your deposition technically is going to be in
11   the court file anyway.  It's going to be public record.
12     A.   Okay.  But --
13     Q.   So you want me to fly back up here and sit across
14   from you and let you read it?
15     A.   No.  I didn't say that.  You can send it in the
16   mail.
17     Q.   No.  I cannot give you a copy in the mail.  I can't.
18   That's getting one free.  I can't let you have it.  That's
19   unfair to him.  He's got a family to feed.  I can't do it.  I
20   mean, I can't.  I say that in front of him because I don't
21   want him to ever think that I'm giving away his work for free.
22   I can't do that.  So I will make arrangements even if it's me
23   to come back up and you can read the depo and make the changes
24   and I'll just take it right back.  We'll do it that way.
25     A.   Well, you said that you're coming back anyway for

```
 1   discovery production.
 2            MS. SAVOR:  Well, I'm here for the discovery.  I
 3      have got your discovery.   We'll go off now.
 4            (Whereupon, the deposition concluded at 12:30 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                         CERTIFICATE OF OATH

2

3    STATE OF FLORIDA )

4    COUNTY OF ALACHUA)

5

6        I, Steven E. LeBlanc, Sr., Registered Professional

7    Reporter, Notary Public, State of Florida, certify that

8    ABDELAZIZ BILAL HAMZE, personally appeared before me on the

9    24th day of June, 2013 and was duly sworn.

10

11       Signed this 10th day of July, 2013.

12

13

14                                   _____

15                                   Steven E. LeBlanc, Sr.

16                                   Registered Professional Reporter

17                                   Notary Public, State of Florida

18

19

20

21

22

23

24

25
```

47

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA )

3    COUNTY OF ALACHUA)

4

5         I, Steven E. LeBlanc, Sr., Registered Professional

6    Reporter, do hereby certify that I was authorized to and did

7    stenographically report the deposition of ABDELAZIZ BILAL

8    HAMZE; that a review of the transcript was requested; and that

9    the foregoing transcript, pages 1 through 45, is a true record

10   of my stenographic notes.

11        I FURTHER CERTIFY that I am not a relative, employee, or

12   attorney, or counsel of any of the parties, nor am I a

13   relative or employee of any of the parties' attorney or

14   counsel connected with the action, nor am I financially

15   interested in the action.

16

17        DATED this 10th day of July, 2013 at Gainesville, Alachua

18   County, Florida.

19

20

21                              _____

22                              Steven E. LeBlanc, Sr.

23                              Registered Professional Reporter

24

25

48

```
1                    E R R A T A   S H E E T

2              This is to certify that I, ABDELAZIZ HAMZE, have
      read the foregoing transcription of my testimony In Re:
3     ABDELAZIZ HAMZE vs. SGT. JOHN DOE, ET AL, given on June 24,
      2013, and find the same to be a true and correct transcription
4     of said testimony with the following changes (if any):

5     PAGE    LINE    SHOULD READ:

6     ____   _____   _____

7     ____   _____   _____

8     ____   _____   _____

9     ____   _____   _____

10    ____   _____   _____

11    ____   _____   _____

12    ____   _____   _____

13    ____   _____   _____

14    ____   _____   _____

15    ____   _____   _____

16    ____   _____   _____

17    ____   _____   _____

18    ____   _____   _____

19    ____   _____   _____

20    ____   _____   _____

21    ____   _____   _____

22    ____   _____   _____

23

24                                   _____

25                                   ABDELAZIZ BILAL HAMZE
```